BOYLE v. ST. LOUIS & S. F. R. CO. et al.

(District Court, E. D. Arkansas, W. D. April 5, 1915.)

No. 1638.

CARRIERS ☞12—STATE REGULATION OF RAILROAD RATES—REASONABLENESS OF RATES.

On the hearing of a suit by a railroad company to enjoin enforcement of Act Ark. Feb. 9, 1907 (Laws 1907, p. 9), fixing maximum passenger fares at 2 cents a mile, and Standard Distance Tariff No. 3, promulgated by the State Railroad Commission June 4, 1908, reducing freight rates, the results obtained by averaging the earnings and expenses of the company in the state during four years, allocating them between its interstate and intrastate business on the basis of specific and elaborately collected reports of employés in all branches of the service during a test period of two months, demonstrated that the annual net earnings of the company from all of its intrastate business were but little more than 2 per cent. on the agreed valuation of its property devoted to such use,

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

all of which were produced by its passenger business. The passenger fare established by the company was 3 cents a mile, and a test of a 2½-cent rate for 18 months showed that if the statutory rate of 2 cents should be put in force, the result of the company's intrastate business would be a deficit. *Held*, that such evidence entitled the company to an injunction restraining the enforcement of both the act and order of the commission, subject to the right of the estate to apply for further orders to meet changed conditions.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–11, 15–20; Dec. Dig. ⊂⊃12.]

In Equity. Suit by Sidney E. Boyle against the St. Louis & San Francisco Railroad Company and others. On final hearing. Decree for complainant.

John M. Moore, of Little Rock, Ark., for plaintiff.
Joseph M. Hill, of Ft. Smith, Ark., for the Railroad Commission.

TRIEBER, District Judge. This is a bill to enjoin the enforcement of what was designated as Freight Distance Tariff No. 3, promulgated by the State Railroad Commissioners of the State of Arkansas, and also the two cents a mile passenger rate established by an act of the General Assembly of the state of Arkansas in 1907. The bill was filed in July, 1908. The usual allegations that, for the intrastate traffic in Arkansas, these rates are noncompensatory to an extent that they are confiscatory are relied on to sustain the bill. For convenience the plaintiff will be referred to in this opinion as the Company, and the defendant as the State.

A temporary injunction was granted and a new tariff of freight rates adopted under the supervision of the court, which raised the freight rates above those established by the tariff enjoined, and restored the passenger rate of three cents a mile. In 1909 an agreement was made between the State and this Company that the hearing of the cause be postponed until the final determination of similar actions instituted by the St. Louis, Iron Mountain & Southern Railway Company and the St. Louis Southwestern Railway Company, and a further stipulation that the Company should make a test of the passenger rate at 2½ cents per mile, for the purpose of determining what the effect of such a rate would be on the net earnings of the Company. For 18 months, in the years 1909 and 1910, the Company made the passenger rate for intrastate traffic 2½ cents per mile in the state of Arkansas, and then claimed that the test showed that that rate was not remunerative, and restored the 3 cents rate. In due course of time the other cases were heard in this court, and then appealed to the Supreme Court of the United States, where it was finally held that the evidence failed to show the invalidating facts by such definite and convincing proof as would justify the court to override the action of the State upon constitutional grounds, and the bills were directed to be dismissed without prejudice. Allen v. St. L., I. M. & S. Ry. Co., 230 U. S. 553, 33 Sup. Ct. 1030, 57 L. Ed. 1625. The opinion in that case was delivered on June 16, 1913. The week before, June 9, 1913, the opinion in the Minnesota Rate Cases, 230 U. S. 352, 33 Sup. Ct. 729, 57 L. Ed. 1511, had been filed.

After the opinions of the Supreme Court in these and other rate cases reported in 230 U. S. 352, 33 Sup. Ct. 729, 57 L. Ed. 1511, had been filed, the general managers of a number of the western railroads, including this Company, met in conference with a number of prominent railroad officials, chief engineers, auditors, statisticians, comptrollers, and general attorneys, to devise a formula for the purpose of dividing valuations and expenses between intra and inter state, and freight and passenger traffic, upon the basis suggested by the Supreme Court in the Rate Cases, namely, by basing the division independently of revenue, but solely as found in the use that is made of the property by each. As a result of their labors a formula was prepared to be used in the apportionment of revenue, expenses, and valuation of property to intra and inter state passenger and freight traffic. As this formula is a document of 39 closely printed pages, and the different formulæ have been, in many matters, amended to meet the conditions prevailing on the road of this Company in the state of Arkansas, it is not practical to insert it in full in this opinion. It is filed as Exhibit 1, and may be treated as a part of this opinion. To explain it briefly, there was a division of the expense between line and terminal, which was apportioned between freight and passenger and between intra and inter state traffic. Bases were prescribed for the apportionment of revenue to state freight and passenger service, and to interstate traffic. To divide the expenses, formulæ were prepared to ascertain separately the actual cost of maintenance of way and structures, maintenance of equipment, traffic expenses, transportation expenses, and general expenses. For each of these, formulæ were made covering every item pertaining to them, respectively. Thus, for maintenance of way and structures there are 23 different items to be considered, nearly every one of them subdivided into smaller units, and for some other items even a larger number of subdivisions was made, while in others a smaller number. The formulæ for dividing between line and terminal expenses contains 116 items.

Immediately after this formula had been made, the Company made preparations for the final hearing of this case, and prepared the necessary statistics in conformity with this formula. As no separate records had previously been kept by this or any other Company of every item of expenditure pertaining to intra and inter state and freight and passenger traffic, and especially such records as would enable them to make the allocations and apportionments so as to conform to the rule established by the Supreme Court in the Rate Cases, it was necessary to make special tests of the use which was made of every branch of the road, by ascertaining the separate items of expense of intra and inter state passenger and freight business, which could not be accurately determined from its records, as previously kept. These tests were made during the months of November and December, 1913, less than five months after the decisions in the Rate Cases had been announced. In order to make these tests accurately, printed blank forms were prepared by the Company, with printed instructions to the employés on the back of the form, on which they were to report every item of cost and the use made thereof, whether for freight or passenger, intra or inter state traffic. Copies of these forms and instructions are filed as exhib-

its to the Company's testimony. These data could only be obtained with accuracy concurrently with the operation of the road. From the reports made on these forms it was ascertained what character of freight and in what quantities each train, freight, passenger, mixed, and through, carried within the state and the expense connected therewith. To obtain this information clerks were placed upon every train running in Arkansas during the entire two months of November and December, 1913. Special yard clerks, employed for that purpose, were placed at the termini of all through freight runs to record and report all of the contents of the trains, and when they arrived and left. The conductors in charge of through freight trains were required to record the character and quantity of freight, distance hauled, the freight picked up by and set out of the train at each station between the termini of the run. The yard clerk at the arriving terminal of that train was required to fill in on the report handed to him by the conductor, and which the conductor had received from the clerk at the departing terminal, all the data showing what was received there, and what was set off on that train; they were also required to record what time was consumed in unloading and loading, as well as switching, in each yard, and by these means the data for the factors, representing quantity and quality of traffic carried on the different trains, were obtained. Similar records were required to be made as to all other matters connected with the cost of the other divisions of the formula.

For the passenger traffic, the division of expenses, both line and terminal, between straight passenger traffic, baggage, mail, and express, Pullman, and dining cars, was made on the "car foot mile" basis. The actual consist of cars in every passenger train was analyzed, and the number of lineal feet in each train, assigned to the service, were determined, the measurement of the space assigned in each car to each class of service being multiplied by the number of miles that car ran in Arkansas.

The same analysis which was made of the freight traffic was made of the passenger train traffic; analysis of the number of stops and terminal delays; time devoted by yard engines to the various classes of service; the time of yard and station agents' work; the time of station employés devoted to the various classes of service. All were worked up in the same detail and reported on the ground where the operation occurred. The results of the passenger investigation were ascertained from these reports and filed as Exhibit 12 by the Company.

To obtain the necessary data to allocate the expenses of maintenance of way, the section foremen on the entire road in the state of Arkansas were required to keep, during the months of November and December, 1913, a strict and correct account of the entire labor and material expenditures. An experienced man would be sent out on the road, who would sit down with each section foreman, take his time and material books, of which he rendered a report each month to the superintendent, and classify each track over which each individual section foreman had charge, according to its use as a line track or terminal track or common to line and terminal. If it was used exclusively for the freight terminal service it was marked as a freight terminal track; if it was used

exclusively for line service it was marked as a line track. The straight line tracks, which were common to freight and passenger, were treated separately for each. He was then required to enter on each track section (five or six miles), each day, a division of his labor and that of the men employed under him, and also the material used as between these different classes of track. His time and material books were fitted to the tracks which he had in his charge, each of the tracks being numbered. When his reports came in they were classified, and in that way the actual maintenance of way expense for these two months obtained, and then subdivided between freight and passenger tracks and line and terminal tracks. The same method was applied to the buildings, crossings, and other matters which are in charge of section foremen. As to the bridges, buildings, and similar structures, the Company always kept regularly structure reports, in which the charges for the repairs or maintenance are kept separately, and there it was only necessary to classify these according to the use, as between line and terminal, intra and inter state, and freight and passenger. If the expense was for the freight platform it would be charged to the freight terminal, and the same process followed whatever use was made of it. As the main line between the states was used in common by freight and passenger service, it was divided between them according to the use; for the freight service the engine ton miles was used. They divided the expense of maintenance of way between that which is charged to direct wear and tear, by reason of the running of trains and that which accrued from the elements. Mr. Hamilton, the company's accountant, fully explained the reasons for adopting this basis, which it is not deemed necessary to set out here. After making these explanations he stated that not a single item was left to conjecture, but allocated according to its use as ascertained in the manner stated.

In order to obtain the station expenses during the two months mentioned, every station agent within the state was required to make a study and keep a daily record of the time he and each of his employés devoted to freight service or passenger service, to handling of mail and express, or telegraph service, and report at the end of the month. The wages of the station agent and his employés were divided on the same basis as the freight and passenger, etc., by each employé or particular class of employés engaged in the same nature of work. He sent out some of the best men to instruct the agents before the work was begun, having them meet at central points for instruction. These reports, when received, were carefully examined and tabulated. In this manner it is claimed there was obtained a correct report of the actual use of the station force made by state and interstate freight and passenger service, and the number of shipments each agent received and forwarded during these two months. The wages of the freight clerks who were engaged in the handling, recording, and waybilling the expenses of the freight consignments were divided between state and interstate in accordance with the number of consignments of each class received and delivered at each individual station.

The warehouse force is shown separately in these reports, and they were divided on the basis of the number of tons of less than car load

freight, state and interstate, received at and forwarded from that particular station. Instead of simply dividing the total station expense in the state and arbitrarily assigning them to freight and passenger, the actual cost and performance, state and interstate at each station, was localized.

The expense for terminal charges was localized to the state where the terminal is local, and that state was compensated for it. To obtain the proper data the cost per ton of terminal service within the state was determined for freight and passenger by ascertaining the average cost of a ton of freight each mile and the average cost to line cost of a passenger one mile. This was reduced to the cost per mile and the mileage thus ascertained according to the number of terminals in the state. Every entry on the company's books affecting every item of revenue was analyzed. All switching absorptions made by the Company were analyzed and attached to the specific haul on which that switching was absorbed. If the switching operation was on intrastate business it was deducted from the intrastate, and the same with interstate absorptions. The station portion of the terminal expense was divided on the basis of the actual tonnage handled in and out of each individual station during the two months. Each individual yard was treated separately, and the expense of that yard treated separately. Actual account was kept of how much time each local freight train in the state switched, thus enabling them to ascertain the exact time devoted to switching and loading and unloading freight at each station by the agent at that point. These reports show how long the train stopped for other purposes, such as taking coal and water, meeting and passing trains and getting orders, and these were charged to line. By segregating the actual performance of the local and through trains it was found out how much time each devoted to this terminal, and the expense was divided on the basis of that time. As local freight trains but very seldom have the use of a switch engine, the engine of the train doing the switching was charged to terminal service.

For passenger terminal expenses no switching or loading nor unloading expense was charged, as that is unnecessary. The first sixteen exhibits of the Company give summaries of each of these items of expense for these two months.

The expenses of intrastate passenger traffic were divided between intrastate passenger miles actually determined within that period and the cost per passenger mile for all expenses by this method arrived at. The same method was followed for the interstate, and thus the excess cost relation of the two determined. The excess cost of the intrastate passenger on the basis of use of the property, it is claimed on behalf of the Company, was found to be 15.43 per cent. more than that of the interstate passenger, and for the freight service the intrastate was found to be 319.58 per cent. greater than the through.

Comparisons were made of the test period commencing with the year ending June 30, 1913, and working back to the last four months of the year 1907, and that comparison, it is claimed, shows that the test period was reflective of and practically the same as for the other

years. The difference was slightly in favor of the State, as under this formula the State of Arkansas was only charged with about 98.98 per cent. of expenses as compared with the former formulæ of 100 per cent. The witness selected the year 1912 as a type of all the years preceding it for the purpose of comparison. He took the amounts which had been reported to the State Railroad Commission, and which had been ascertained to be the exact earnings and expenses for the State on the basis of the old formula, and equated them on the basis of applying the two formulæ, the old and new, and the result was practically the same. The method adopted is thus explained:

"The Company, in preparing its reports to the Arkansas Railroad Commission during the years ended June 30, 1910, 1911, 1912 and 1913, used a formula for the allocation of revenue and expenses to that State, which was uniformly applied throughout all those years. It also had in use, uniformly through all the years mentioned, a formula for the division of expenses between freight and passenger service for the purpose of its own operating comparisons. To accomplish a reassignment of earnings and expenses to Arkansas for these years under the new formula, in time to prepare for the trial, and to avoid the enormous expense incident to reworking all the voluminous details, it was felt that a proper showing of the earnings and expenses in Arkansas divided between the freight and passenger services for the years mentioned might be made by determining the relation of the results obtained for the year ended June 30, 1913, from an actual application to the earnings and expenses of the railroad of the new formula and the formulæ formerly used in making reports to the State Railroad Commission, dividing expenses between freight and passenger for the purpose of operating comparisons, and by equating the earnings and expenses reported to the State Railroad Commission, and as divided between freight and passenger, on the basis of the percentage relation of the results as applied to the new formula and the result of applying the Railroad Company's old formulæ to the earnings and expenses of the year ended June 30, 1913, in minute detail. That is to say, if a comparison of the results obtained under the new formula with the results obtained under the application of the old formulæ showed that in the year ended June 30, 1913, the new basis assigned to Arkansas or to freight and passenger on a given time of earnings and expenses, 102 per cent. of the amount assigned for the same item under the new formulæ to the amount assigned under the old formulæ for the years ended June 30, 1910, 1911, 1912, and the four months ended December 31, 1907, then they have been increased 2 per cent. If, on the other hand, the amount assigned in the year ended June 30, 1913, under the new formula was 98 per cent. of the amount assigned under the old formulæ in that year, the amount assigned under the old formulæ in the prior periods was reduced 2 per cent. This equation was applied only to such items as could not be actually allocated to Arkansas, or between freight and passenger, and could only be so allocated by means of a detailed analysis or prorate. Such items as permitted of actual direct allocation, without analysis or prorate, were directly allocated in each of the years, namely, intrastate freight and passenger revenues, mail and express earnings, and special service train revenue. For the year ended June 30, 1908 (which included the four months ended December 31, 1907), when they had not made any assignment of earnings and expenses to Arkansas, but had reported to the Railroad Commission of that state the earnings and expenses of the entire railroad, it was necessary, in order to carry out the plan hereinbefore outlined, to assign expenses to Arkansas and between freight and passenger for the four months ended December 31, 1907, on a basis of the railroad's old formulæ used in making such assignments and division in the years ended June 30, 1910, 1911, 1912, and 1913. It was then practicable to make the same equation of earnings and expenses for the four months ended December 31, 1907, as was made for the years ended June 30, 1910, 1911, 1912, and 1913."

222 F.—35

Mr. Simson, the State's accountant, criticizes this method of equation, as in his opinion a proration or subdivision which depends upon special information taken outside of the period to which it is to be applied, and which is of such a nature as cannot be verified in its total, is not a proper basis for division, unless it is shown that all the conditions are identical in both periods. In criticizing the results as shown in the Company's Exhibit 27a he says:

"Had the percentages of difference of the subclassifications, that is, the individual interstate commerce reports, been worked out, and the percentages applied to these individual accounts, the equated figures for the four months ended December 31, 1907, would have differed from the equation as totalized by $7,397.80, the equation as individualized would have been less than is the equation of subtotals."

After this testimony of Mr. Simson's had been given, Mr. Hamilton made the equation by the individual Interstate Commerce Commission accounts as suggested by Mr. Simson, and assumed the Company's material burden from the freight to the passenger side, and the result of this equation was that, instead of assigning to Arkansas $7,397.80 less, as Mr. Simson thought would be the case, there would have been $8,400.38 more assigned to the State, but in his opinion his Exhibit 27a is correct, and he was of the opinion that the traffic in Arkansas should not be charged with that additional sum. No rebuttal was offered by Mr. Simson or any other witness as to that statement. In the opinion of the court, if correct factors are used, and the court finds that they were, this method of equation will secure results as nearly correct as is possible, when no separate accounts of the cost of the two classes of traffic have been kept.

Mr. Hamilton, the witness who testified as to these matters, was in charge of that work with a large number of others employed by him, and he explained that to obtain this information the road in Arkansas was divided into divisions, with a head clerk for each of them to supervise the others. These reports were then sent to Mr. Hamilton, and his force tabulated them under his supervision, and from them the various exhibits, which were introduced in evidence in the case, were prepared. In order to make these exhibits correctly an analysis was made of all the different items, so that they could be properly allocated according to the use made of them. The same methods were employed for the purpose of ascertaining the exact cost according to the use of locomotives, cars, coaches, and everything in any wise connected with the transportation department. Apportionments of the passenger traffic were made by car foot miles as stated, their use being subdivided between sleeping cars, day cars, baggage, dining, mail, business, and other cars under their respective numbers, and as to state and interstate passengers.

After these exhibits had been introduced on behalf of the Company all the reports upon which they were based, all the records kept by the Company, and the work sheets which had been used by the statisticians in the preparation of the various summaries, as shown by the exhibits filed, were submitted to and examined by the accountants for the State, and the same course was pursued with the exhibits filed by the State, the work sheets and data being submitted to the accountants

for the Company. While some few errors were found in the exhibits of each they were corrected, or, as stated by the accountants, "ironed out," and new exhibits filed by each side, which both parties agree are mathematically correct, but each criticizes the methods and bases employed by the other in preparing these final exhibits. The case was submitted on the corrected exhibits.

On behalf of the State, while attacking the formula used by the Company as incorrect, no formulæ as to how the different apportionments should, in their opinion, be made were presented, but all its exhibits are based upon the same formula used by the Company and the records of the Company, but divided according to the methods its accountants considered proper, except that instead of separating the Arkansas business from that of the entire system, the accountants for the State assumed that there was no difference in the cost of operation in the state of Arkansas from that in the other states. Nor was any distinction made in the difference of cost between inter and intra state business either in the state of Arkansas or any other part of the entire system. Why no such separations were made is not explained by any of the witnesses for the State.

The position of the learned counsel for the State in the argument, as stated by him, was that the burden to establish, by proper evidence, that the rates sought to be enjoined were noncompensatory to the extent of being confiscatory was upon the Company; and, if it failed to adopt the right bases from which the court can be clearly convinced that the rates are confiscatory, relief must be denied to the Company.

When the hearing first began considerable evidence was introduced on the part of the Company to establish the value of its road in the state of Arkansas, but later a stipulation was entered into between the parties agreeing that for the purpose of this case the average value per year of the property in the state of Arkansas for the years 1910, 1911, 1912, and 1913 was $17,924,441.75, the value fixed by the state taxing board, and that the gross earnings in the state for the four years had been $16,688,486.86, divided as follows:

|  | Intrastate. |  |
| --- | --- | --- |
| Freight. | Passenger. | Total. |
| $1,045,182.50. | $1,634,913.09. | $2,680,095.59. |
|  | Interstate. |  |
| $10,150,834.01. | $2,990,732.40. | $13,141.566.41. |

In addition there was, during that period, earned from mail and express from both classes of traffic, intra and inter state, $866,806.86, making the total $16,688,486.86. It was also shown by the undisputed evidence that these were normal years, and by dividing these items by the factor 4 the average total gross earnings in the state for one year amount to $4,172,121.71.

As to the intrastate traffic it is shown by the evidence that during those years the higher freight tariff, adopted after the temporary injunction had been granted, and which is referred to by all the witnesses as the "court tariff," was charged, and a passenger rate of 3 cents per mile, instead of the 2 cents rate, established by the statute, with the exception of the 18 months above referred to, when only $2\frac{1}{2}$ cents per

mile was charged, while the interstate passenger rate was 3 cents per mile all the time; that by an exact computation, taken from the way-bills, freight charges, and passenger reports, it appears that had the tariffs which were enjoined by the interlocutory injunction been charged, the income from the intrastate business in the state would, during that four-year period, have been $456,103.72 less, divided as follows: Freight, $20,389.53, passenger, $435,714.19. Deducting this difference, it is claimed on the part of the Company that there was an actual loss on the intrastate business in the state of Arkansas, for these four years, of $122,651.26, or for each year, $30,662.81; that upon the entire business in the state, freight and passenger, intra and inter state, the Company made a net profit on the stipulated valuation equal to 5.63 per cent., which would have been slightly greater but for the loss caused on the intrastate business.

It is also shown by the evidence, and the court so finds, that the months of December and November, 1913, were normal months for that road in the state of Arkansas as reflective of the year's business. By this is not meant that the earnings or expenses of these two months were exactly one-sixth of the entire year, but that the relation between the different articles of traffic and expenses based on the traffic are substantially the same as for the entire year, and this was verified, it is shown by the witness Hamilton, by comparing them with the four last months of 1907. It was also shown that, although the traffic during those four months constituted a little over 36 per cent. of the entire year's business, the expense, as well as the use, was reflective of the entire year. The reason the months of November and December, 1913, were used for the purpose of making the test, it is explained, was that until after the opinion in the Minnesota Rate Case had been announced, other bases had been used by all the railroads, including this Company, which were disapproved by the Supreme Court in that case; that in order to obtain the facts to conform to the rules established by the Supreme Court's opinion in the Rate Cases reported in 230 U. S. 352, 33 Sup. Ct. 729, 57 L. Ed. 1511, it was necessary to prepare a proper formula, which was done, as heretofore explained, and also to prepare forms on which the necessary information was to be noted as ascertained; also to create the force necessary to obtain the data and record them on these forms in conformity with these instructions to the employés, and thereby secure accurate information from which to prepare the statistics for the hearing of this cause under the new formula.

In this connection it is proper to state that in none of the exhibits, the Company's nor the State's, is the year ended June 30, 1909, included. The cause of this omission is that for the purpose of equating, the reports of the Company made to the Arkansas Railroad Commission were used, and no such reports were required to be made until the year ended June 30, 1910. The statistics, as shown by the exhibits filed by both sides in this cause, are for the years ended June 30, 1910, 1911, 1912, and 1913.

The criticisms by the State of the formula used by the Company are found in the testimony of Mr. L. S. Mayer and Mr. L. N. Simson. Mr. Mayer is the auditor of the Corporation Commission of the State of

Oklahoma, in charge of the division of statistics and accounts. His experience, as shown by his testimony, is that he worked as a section hand on the Burlington Road during three months in the summer for a number of years; the third or fourth year he was promoted to the position of timekeeper on the section; he worked about six months each year for two years and then became a freight brakeman on the Iowa Central, remaining there for about six months. He then worked in the machine shops of the Burlington Road as a laborer and then a machine helper, and finally was employed in the office keeping time. He then was employed in the chief dispatcher's office, handling car distribution, and doing general clerical work in that office and that of the superintendent. In June, 1908, he went to the Chicago & Alton Road, where he did similar work, and for a short time during the rush period was acting as assistant trainmaster at Springfield, Ill.; he then was connected with the maintenance of way and bridges department, and for the last three years has been auditor of the Oklahoma Commission. He is not a civil or mechanical engineer, and has had no experience in these fields. His experience is set out so fully here for the reason that his competency, as well as his impartiality as a witness, were seriously attacked by counsel for the Company. He was the only witness who testified as an expert on behalf of the State on the matters not connected with the accounting. His criticism is of the following bases used in the formula of the Company's Exhibit No. 1: The engine ton miles which was used by the Company's accountants in determining the use of the roadbed for freight, because the engines are classed for potentiality and but seldom carry as much of a load as is assigned to them by the classification. He also criticizes the formula used for passenger trains, which is not based on potentiality, but on the car miles handled, as the number of cars frequently varies. He criticizes the theory which is used for the division of transportation expenses because he says it is cumulative and affects the division of the property injuriously, so far as the State is affected. The division of yard and station expenses between line and terminal is severely criticized by him. In his opinion the terminal should be on actual tons using the cars and not by throwing them in a pool. The same criticism he also applies to some of the station expenses and to wrecks. The division between line and terminal at division points is criticized, and also the division of the cost of maintenance and equipment. The test period made in November and December, 1913, is, in his opinion, not indicative of the normal business for the year, and therefore should not be considered as fair or proper.

As to the engine ton mile basis adopted by the Company, the court is of the opinion that it is the best method that can be adopted to obtain results as accurately as in a matter of this nature is possible. While it is true that only when conditions are ideal the freight haul is 100 per cent. of the potentiality of the engine, the evidence shows that this ideal condition never prevails. It also appears from the evidence that if the load is light the train travels faster and thus correspondingly reduces the cost, and this applies especially to the through freight trains. Besides, by applying this basis to the entire

traffic, it can do no injustice to any of it. One of the elements of the greater cost of handling local freight than through is the fact that it carries a much less proportion of the engine potentiality. The evidence shows that while local trains on this road in Arkansas only carry 67 per cent. of the engine potentiality, the through trains carry 90 per cent., an item which adds to the greater cost of local freight trains.

Aside from this, the potentiality of the engines is very much affected by many other conditions, among them, grades, trestles, and bridges, cold weather, snow and rain. The evidence shows that this Company has two main branches of road in the state of Arkansas, one running north and south in the western part of the state, and the other running east and west in the northern part of the state. In the former, which is a mountainous country, the grades are considerable, while the latter runs for a large part through river bottoms, with many bridges and trestles, partly subject to overflow from the Mississippi and St. Francis rivers, and during the rainy season is seriously affected as to the potentiality of the locomotives. But, leaving these out of view, if Mr. Mayer's contention were sustained, it is shown by the evidence of Mr. Hamilton that calculations, based upon actual investigations, show that if Mr. Mayer's views were adopted it would result in a loss to the intrastate traffic, as of the element of expense charged to freight, the intrastate is only charged with 4 per cent., and that of passenger would be 30 per cent. Nor would the contention of Mr. Mayer that only 10 per cent. of the expense of maintaining the track is caused by the use, and the other 90 per cent. by the elements, change the result to any extent, as the difference would only be a 2 per cent. decrease of the charge to the freight and increase the same amount to the passenger. On the other hand, if the cost of maintenance of way is raised to 25 per cent. and that due to the elements reduced to 75 per cent., as is claimed by some of the witnesses for the Company to be a proper division, the result would be practically the same as that on the basis adopted by the Company according to its formula.

That the passenger trains are not based on engine potentiality, but car miles, is clearly right, for the trains are made up to accommodate that traffic, and the expense should be regulated by the number of cars drawn, even if there are not sufficient passengers to fill every seat. The Company cannot provide the passengers, but must provide the cars.

The criticism of the apportionment of property values in the state between state and interstate on the relation of transportation expenses is that the raising of any item of expense in one class of service puts more property valuation on the state for intrastate business. But the same objection applies to all allocations of expense, for when the common factor is wrong the result is bound to be wrong also. The question, therefore, comes back to the main issue, are the exhibits used by the Company based on correct or incorrect bases, upon the determination of which depends the claim of the Company that the rates sought to be enjoined are noncompensatory and confisca-

tory? The criticism of Mr. Mayer of the division of yard and station expenses made by the formula of the Company is based on the fact that what is called terminal expense is only a part of it. He says that:

"Under the formula used, all business passing through the junction from branch line points is line, and all of the expense going to foreign roads or coming from it is terminal"

—thus causing, as he claims, the intrastate traffic to bear, not only the expense of its own terminals, but those of the interstate. After Mr. Mayer had testified on that point the accountants for the Company made an investigation of the effect upon the results, if Mr. Mayer's plan had been followed. The investigation was made at Fayetteville, Ark., which is on the main line and also the terminus of two branches, and one of the largest stations of the Company in Arkansas, with the result that under Mr. Mayer's formula intrastate traffic would have been charged with almost 100 per cent. more than it was under the Company's formula. This evidence is uncontradicted, and the figures charged on the work sheets, which were submitted to the accountants for the State, are conceded to be mathematically correct. The difference between the two contentions is that Mr. Mayer is of the opinion that every division point should be considered as a terminal in the sense of origin or delivery. On the other hand, the contention of the Company is, and their calculations are made on that theory, that such terminal service was an incident to the transportation from origin to destination, and had nothing to do with the receipt, handling, storing, or delivery of the freight, which constitute terminal expenses. In the opinion of the court the formula of the Company on that item is correct, that it is a haulage, and not a terminal charge. The error of Mr. Mayer, in the court's opinion, is that he confounds the yard and station expenses with the terminal. In the one instance it is a part of the haul, while the latter is that of receiving, storing and delivering.

The formula for the maintenance and cost of equipment is found on pages 9a and 9b of Exhibit 1 of the Company. This has also been severely criticized by the State. The witnesses introduced by the Company testified to the correctness of this formula. In addition to the Company's own employés it introduced Mr. W. E. Symons, whom the testimony shows to be a mechanical engineer of great experience and high reputation in connection with that branch of the railway service, not only in operating, but designing, cars and locomotives. The high standing of Mr. Symons is evidenced by the fact that in some few matters he criticized the formula prepared by the railroad managers, which was used as the basis of the Company's Exhibits, and thereupon changes were made by them in accordance with his suggestions. For the last few years he has retired from active railroad service and acts as consulting engineer. He also acts frequently as arbitrator in cases of damages growing out of injuries to freight cars and locomotives on different lines. The confidence reposed in him is shown by his employment as consulting engineer by the leading roads of the country, to aid them in improving their equipment, owing to his knowledge and experience from the thorough and minute investi-

gations made by him of causes and results. Among his employments was that of securing information with respect to the actual expense of repairing locomotives, freight and passenger cars. It was claimed by Mr. Simson, who is an expert accountant and stands high in his profession, that the bases adopted by the Company are wrong, and those found in an article by Mr. Berry should be adopted. Mr. Symons testified that in his opinion 80 per cent. of the expense of repairing freight cars is due to rough treatment, and only 20 per cent. to the use of the car under normal conditions as to use; that after allocating or subdividing each expense item between line and terminal, the result was the allocation of 75.7 per cent. to terminal and 24.3 per cent. to line; but having in mind certain damage done to cars in line work which he estimated at 10 per cent., he deducted that from the terminal, and added it to line, making the final figures 65 per cent. to terminal and 35 per cent. to line. He files as an exhibit a summary of division of freight car repairs between the line and terminal, based on an investigation on four lines, the Santa Fé, Rock Island, the Missouri, Kansas & Texas, and this road, as confirming his conclusions. He also files as exhibits photographs of damaged cars, showing the damage done by rough treatment, and another exhibit shows how he subdivided the different parts of a car in making his investigations. Repairs to freight cars he assigns 35 per cent. to line and 65 per cent. to terminal. Repairs to passenger coaches he assigns 82.5 per cent. to line service and 17.5 per cent. to terminal. Locomotive repairs he assigns to local freight engines 60 per cent. to line and 40 per cent. to terminal; to through freight engines 68.4 per cent. to line and 31.6 per cent. to terminal; to local passenger engines 64 per cent. to line and 36 per cent. to terminal; through passenger engines 71 per cent. to line and 29 per cent. to terminal. Typical passenger trains 82.5 per cent. to line and 17.5 per cent. to terminal, including through and local trains. In his testimony he states in detail how his investigations were made, and his reasons for each subdivision. He filed itemized statements of the different parts of each item which he considered, and the reasons for his conclusions. The higher cost charged by him to terminal for locomotives than for cars he explained to be due to the fact that:

"The engine performs more work entering and leaving terminals than any other unit in the train; the application of the brakes being more destructive to the engine."

On the part of the State, Mr. Simson, who frankly admitted that he is only an accountant, with no knowledge or experience of any kind in the management or operation of railroads, prepared his statements of these costs from the tables used by Mr. Berry in a paper prepared by him and read at a meeting of the American Railway Engineer and Maintenance of Way Association held in 1904, on the subject of Reduction of Gradient and Elimination of distance curvature and rise and fall on the Union Pacific Railroad. Mr. Berry is very eminent in his profession as a civil engineer engaged in construction work, but as he admits that he did not possess the necessary knowledge as a mechanical engineer, he adopted the tables prepared by Mr. A. M.

Wellington and Prof. Webb (of neither of whom Mr. Simson had ever heard) affecting operating expenses, and from these tables Mr. Simson assigns:

| | Line. | Terminal. |
|---|---|---|
| For engine repairs | 58.48% | 41.52% |
| Passenger cars | 63.88% | 36.12% |
| Freight cars | 61.72% | 38.28% |

In making these figures Mr. Simson does not express any opinion as to whether the tables he used were correct or not, as he admits his lack of knowledge to form such an opinion. He finds that the Company's method is 24.5 per cent. in excess of terminal and a similar per cent. too little for line expenses. The tables used by Mr. Berry did not make any division between line and terminal, but Mr. Simson, taking the different items, allocated them between line and terminal as he assumed they should be, although he admits that he knew nothing of this matter. In his testimony he states:

"I found nothing in Mr. Berry's tables to guide me in making a line and terminal division in any of his subdivisions of cost of repairs. Mr. Berry had no line or terminal division in mind in his paper."

Coming back to Mr. Wellington's tables, Mr. Symons testified that:

"These tables were first published in 1877; that the data for them were secured from the Atlantic & Great Western Railway, which was first a broad gauge road and then was changed to standard gauge; that the freight cars then used were flimsy as compared with those of the present day, and cost about $500. The equipment then in use [freight cars, locomotives, and coaches] has no application whatever to present day conditions."

He further says:

"As an illustration, Mr. Wellington assigns a certain percentage of contributing causes to making up and starting out trains. It was customary, in those times, for an engineer and fireman to get up in the morning and build a fire in the locomotive, and while steam was raising they would get their breakfast; then they came back and switched out their trains, and after they had switched a long time, they took their train and proceeded over the road. There are no such conditions nowadays at all. There were very few yards in those days except the yards that were used by the trains when they came in at the end of the run. Mr. Wellington's tables were based upon conditions that have so completely changed, both with reference to railway operation and with respect to the character of equipment and the business of handling it, that it would not be applicable at all, although the fundamental principles are good, and Mr. Wellington was one of the brightest and ablest railway men the country ever produced. His book has a front place in my library, and I prize it highly; his tables on equipment, however, are completely out of date. That road is now a part of the Erie Railway. In making an examination of the equipment and facilities for its maintenance of the Erie Railway in 1907 it was necessary for me to personally inspect every car, or some of each series of cars, on hand: among the cars still carried on the Company's schedule of equipment were some of these old 20 and 25 ton wooden box cars, originally the property of the Atlantic & Great Western. They were being used for boarding or camp cars. I recommended that they scrap all of them and write them off the books. They were good cars in their day, but there is no such equipment used now, and a distribution of contributing causes of repairs to equipment, based upon cars or locomotives of that type, and upon conditions of that period, is not a good rule to attempt to copy now. Another very important feature was that in those times all cars had what was called a link and pin coupler, making it necessary for the brakeman to go between the cars to where he made the coupling, and they were handled very carefully compared to what they

are now. Since the automatic coupler has come into use, and it is unnecessary for trainmen to go between the cars, the destructive effect of such has gone up enormously. It did not obtain in those days. If it had the cars would not have been there for me to have seen them in 1907."

In view of Mr. Simson's testimony that the Wellington tables used by Mr. Berry furnished no data for making a division between line and terminal, and that he had no practical knowledge whatever on the subject, the further fact that conditions have so materially changed since Mr. Wellington prepared his tables that they are inapplicable to present-day rolling stock of railways, and the testimony of Mr. Symons and that of the other witnesses who testified on that subject, Mr. Simson's calculations on that subject, as shown by his exhibits, are of no value whatever.

On the part of the State it is contended that the reduced passenger rate of two cents a mile would stimulate that traffic to such an extent that the intrastate business would be the gainer, or at least not a loser. For the interstate passenger business the Company charged three cents, and in order to ascertain what the effect on that claim is, a test was made for the month of August, 1913, which, it is claimed, shows that while it increased the intrastate business it did it at the expense of the interstate business. (The two cents rate went into effect on this road in July, 1913.) In order to get the exact factors, train auditors and collectors were, after the two cents rate was put in effect, put upon all trains crossing the borders of the state, with instructions to make a detailed check of all passengers who bought tickets or paid fares on the train at the boundary stations of the state. These reports show that there was an abnormal increase in the purchase of tickets at these boundary stations. The record shows the following increases at some of the boundary stations:

|  | Total Number of Ticket Sales and Cash Fares Paid. |
|---|---|
| Osborne, Ark. | |
| August, 1912 | 8 |
| June, 1913 | 12 |
| August, 1913 | 142 |
| Rogers, Ark. | |
| August, 1912 | 2,532 |
| June, 1913 | 2,999 |
| August, 1913 | 4,321 |
| Arkinda, Ark. | |
| August, 1912 | 176 |
| June, 1913 | 137 |
| August, 1913 | 935 |
| Mammoth Springs, Ark. | |
| August, 1912 | 656 |
| June, 1913 | 349 |
| August, 1913 | 1,684 |
| Yarbro, Ark. | |
| August, 1912 | 577 |
| June, 1913 | 345 |
| August, 1913 | 810 |
| Summers, Ark. | |
| August, 1912 | 118 |
| June, 1913 | 91 |
| August, 1913 | 554 |

In the interior stations the increase was not so marked, still noticeable. In Jonesboro and Hoxie, Ark., the increase was 33 per cent.; in Ashdown, Ark., 31 per cent., and Wilson, Ark., 28 per cent. That in these interior stations a very large part, if not all, of this excess is attributable to the fact that the state rate was only two cents, while the interstate was three cents per mile, is beyond question. Take Jonesboro as an illustration. That city is about midway between the Tennessee and Missouri borders. A great deal of its traffic is with Memphis, Tenn., which is separated from Arkansas by the Mississippi river. A person going from Jonesboro to Memphis, by purchasing a ticket to Bridge Junction on the border of the state, would pay 2 cents a mile and 25 cents for crossing the bridge to Memphis, but if he purchased a through ticket to Memphis, that being an interstate trip, he is charged with the rate filed with and approved by the Interstate Commerce Commission, 31 I. C. C. 532 (where it was held that the 3 cents per mile interstate passenger rate in Arkansas was not unreasonable, although the intrastate rate was 2 cents per mile), 3 cents a mile to Bridge Junction and 25 cents for the bridge fare. The same thing would apply to those who went west to Missouri points. By purchasing a ticket to the last station in Arkansas he would pay 2 cents; he would then pay the 3 cents rate to the first station in Missouri, which, under the statutes of Arkansas, can be paid on the train, without any additional charge; then from the first station in Missouri to his destination he would again pay the 2 cents per mile prevailing in that state. The same condition exists at Hoxie, which is a short distance west of Jonesboro, and no doubt at almost every station in the state to some extent. As the western branch of this road crosses state lines a number of times, the effect is naturally considerable.

It is also shown that while the intrastate passenger business increased for the last six months in 1913 when the 2 cents rate was in force, from 16.31 per cent. for the year ended June 30, 1913, to 19.06 per cent., the interstate decreased during that period from 47.67 per cent. to 39.89 per cent. The evidence also shows that for the year ended June 30, 1910, while the 2½ cents rate was in force, the receipts from passenger traffic were, intrastate, $362,485.87, and interstate, $661,-500.07. For the year ended June 30, 1913, when the 3 cents rate was in effect, the receipts from passenger traffic were, intrastate, $415,-183.99, and interstate $775,599.41. Had the 3 cents rate for intrastate traffic been in force in 1910 the receipts from that traffic would have been $434,983.94, or $19,799.05 more than for 1913, while the interstate passenger traffic for 1913 shows an increase of $114,099.34.

From the evidence the court finds as a fact that the 2 cents rate does not stimulate passenger traffic, except at the expense of the interstate. People are not in the habit of traveling merely because rates are lower. It is probably different when special reduced rates are made for certain occasions, but in such cases it is the special occasion which causes it.

There is also a criticism of the method by which the terminal expenses are charged by the Company. The accountant for the Company made the cost of terminal for each ton of freight 36.486 cents, and

for passenger 8.677 cents, which is shown by the State's accountant to be erroneous and admitted by the Company's accountant, if the division of expenses is based upon tons and·passengers. The corrected figures upon that basis should be 31.319 cents per ton of freight and 5.443 cents per passenger. What the actual terminal expenses in Arkansas are is undisputed; both accountants using the same figures, but differing in the methods of division. The Company arrived at its figures on the basis of time devoted by its employés in stations, yards, and train service, regardless of the number of tons or passengers handled, while the State used the latter factors. But in results there is no difference. Mr. Simson, the State's accountant, who prepared these tables, testified on his direct examination:

"The difference cuts no figure in this matter. There is no stress upon that. It is just brought out in the accuracy of the matter."

And again on cross-examination on this subject he testified:

"The result of these errors is that in the intrastate revenues the assignment of passenger and freight revenues to Arkansas is not affected, but in the interstate revenues the mileage allowance is excessive by 11 miles on each ton, and a like excess of 2½ miles for each passenger. * * * The 31 cents allowance on freight and the 5 cents allowance on passenger are merely computed from the basing data that the Company used, to show the error in the method. * * * In other words, the 31 cents was not intended to be considered as a correct terminal allowance of revenue, but was merely computed to illustrate the correctness of the method."

Again, in reply to the question: ·

"If you based that [referring to the allowance of the terminal being excessive] upon the proposition that the application of that to the traffic units of the entire system, would it exceed the total expenses of the system?"

—he replied:

"That would depend upon the accuracy of the Company's statistician as to the freight and passenger, and freight one mile and passenger mile, but we see no reason to question that. Q. Assuming they are correct, then that is your opinion? A. Yes, sir. Q. What effect do these changes in the interstate revenue, as illustrated by the examinations you have given, have upon the intrastate revenues in Arkansas? A. None whatever. Q. Don't you know that the passengers and tons were not used [by the Company] in any way to divide between line and terminal? A. Apparently this exhibit [referring to Exhibit 6 of the Company] so shows. Q. And do not the exhibits based on Exhibit 1 also show that? A. I presume so. I have not examined them for that particular point, and I don't remember. Q. Assuming they do, were the passenger and tons used in dividing between line and terminal? A. I think not. Q. Would not the reconstructive costs of ascertaining under your method exceed the actual cost if it cost more to earn a dollar in the state of Arkansas than on the entire line as a matter of actual fact? A. It would."

It therefore appears from the testimony of the accountants for both sides that this difference in the terminal figures has no relation whatever to the ultimate correctness of the Company's exhibits or to the equating proportions used by the Company to give effect to its new formula, so far as the State is affected, while Mr. Simson's formula would result in increasing the Company's showing of cost charged to the intrastate business in Arkansas.

To review all the evidence, which is quite voluminous, would serve no useful purpose. In fact, the court has set out more of the testimony

than is necessary in this case. The court had the benefit of the able arguments of counsel, which lasted almost two weeks; they were taken down stenographically and furnished to the court in typewritten form; the evidence was reduced to writing in splendid form, and an index of every subject furnished the court. The testimony, as well as the arguments, have, after arranging them on each subject, been read and reread with the greatest care, and every part of it, although not referred to herein, carefully considered, and the conclusion reached that the formula used by the Company in the presentation of this case, allocating the cost of inter and intra state freight and passenger business of the road in the state of Arkansas, according to its use, enabled it to determine the facts as near correctly as a matter of this kind can be. Upon the whole evidence the court finds, omitting for the present the earnings from mail and express, but adding that item later, the average annual income and expense of Company's intrastate business in the state to be:

|  | Freight. | Passenger. | Total. |
|---|---|---|---|
| Operating revenue | $261,295.63 | $408,728.28 | $670,023.91 |
| Operating expenses | $268,983.42 | $317,677.36 | $586,660.78 |
| Total net earnings |  |  | $ 83,363.13 |

The average net earnings from mail and express for a year for the entire business in the state, intra and inter state, are $21,075.97; apportioning them to the intrastate business in the state upon the same basis the other net earnings were applied, they add to the intrastate net income $5,910.89, making a total of $89,274.02, as the annual net earnings from all intrastate traffic in the state, while charging 3 cents per mile for passengers, except during the 18 months when 2½ cents per mile was charged, and the higher rates under the so-called "court tariff."

By adopting the four-year period for averaging the earnings and expenses we are able to get a fairer result than by merely selecting one year, which may be affected by peculiar conditions then prevailing. A four-year period, when the years are fairly normal, will reflect more accurately the traffic and cost.

The evidence, based upon an actual investigation of the records, conductors' reports, and waybills, all the passenger and freight earnings from intrastate business, without making any allowance for the 2½ cents passenger rate which was used during 18 months, shows the average earnings per year from the intrastate traffic would have been $114,-025.93 less if the rates in controversy had been charged. Deducting this sum from the net intrastate earnings leaves a deficit on intrastate earnings of $24,751.91.

It is also proper to call attention to the fact that it appears from the evidence that in ascertaining the effect of the 2 cents rate, it was applied to all passengers, no deductions being made for children, who paid half fare, nor for the lower rates charged to meet competitive conditions from other roads which have a shorter line to some of the stations of this Company, the well-recognized rule being that the shortest mileage between two points establishes the rates for all com-

petitive lines. This is therefore more favorable to the intrastate than the real facts warrant.

What the effect of the 2½ cents rate during the 18 months was has not been shown by any of the testimony or exhibits, but it is shown that for that part of the year 1913 when the 2 cents rate was in effect the difference between the revenue earned from intrastate business in Arkansas and what would have been earned if the 3 cents rate and the "court tariff" had been in force would have amounted for a year to $140,264.55, or $26,238.62 more per year than for the average of the four years which is used by the court in this case. But, in view of the results reached, it is immaterial to consider this difference.

Nor would the percentage of earnings in the state from intrastate as well as interstate business, if applied to the intrastate, show a result which would enable the Company to earn a reasonable return on its investment, which, in the opinion of the court, for the reasons stated in its opinion in the former Arkansas Rate Cases (C. C.) 187 Fed. 290, 348, should be 7.5 per cent. in normal years. The net earnings from all sources in the state, state and interstate, for the average period, are found to be 5.63 per cent. per annum. This leaves out of consideration the difference in cost between the intra and inter state business, which certainly amounts to something, for reasons which require but little discussion; the short haul, the more frequent stops, the additional terminal expense, all add to the expense of the intrastate. But, assuming the same percentage of cost for both classes of traffic, intra and inter state, there must still be a deduction for the diminution in the revenue of the intrastate, which would have resulted if the rates sought to be enjoined had been in force. Taking these into consideration, the result will be, including the mail and express earnings, as follows: The net average annual earnings in the state of Arkansas from all sources were $1,122,463.21; the agreed valuation of the road in the state is $17,924,441. (These figures are the result of the four years, 1910, 1911, 1912, and 1913 average.) This would make a net profit on all the business in the state of 6.26 per cent. Adopting the same bases for the intrastate would make the

Profit on the valuation of the road in the state assigned to intrastate business......................................................... $198,249.25
Deducting the decrease which would have resulted if the enjoined rates had been charged....................................... $114,025.93
Leaves a net profit from intrastate traffic of..................... $ 84,223.32

—which is equivalent to 2.65 per cent. on the valuation of $3,166,921, the value of the road in the state allocated to the intrastate traffic according to its use.

Nor would the result differ materially if we accept the figures of the State's accountants and apply them to the intrastate business of Arkansas, although they are made on the basis of the net earnings of the entire system, an assumption without any basis to support it. The system traverses six states in addition to the states of Arkansas, Kansas, Missouri, Oklahoma, Tennessee, Alabama, and Illinois; the mileage of the entire system is 4,746.32 miles, of which only 597.5 miles are in Arkansas, a slight fraction less than 12.58 per cent. The evidence

shows that conditions in Arkansas differ very materially from some of the other states. Not only is there a difference in grades, bridges, embankments, and topographical conditions which add materially to the cost of operation, but there is a great difference in the density of traffic, which is an important factor in the cost of operation of trains. The density of traffic on the entire system, as shown for the year 1913, is 663,000 ton miles against 545,000 ton miles on the freight side, and 97,000 against 75,000 passenger miles on the passenger side in Arkansas. On the line of the system of this Company between Kansas City, Mo., and Ft. Scott, Kan., the density is over 3,000,000 tons to the mile, and the average of the entire system is materially reduced by reason of less density in the states of Arkansas and Oklahoma. On that part of the road a train hauling from 3,000 to 4,000 tons makes the same speed as a train in Arkansas hauling 600 tons, and the wages of the train crew are practically the same in each. While density of traffic does not affect revenue per ton mile, it gives greater revenue per mile of road. Nor does it make any allowance for the shorter hauls in Arkansas than on the entire system. The undisputed evidence shows that the average haul of all freight in Arkansas, as shown by the reports to the Arkansas Railroad Commission for 1913, was 78.85 miles, and on the entire system 166.21 miles. The average passenger haul in this state is 23.66 miles and for the system 43.65 miles. For the four months ending December 31, 1907, the ton miles hauled in Arkansas was a fraction over 89 per cent. and passengers 81 per cent. as compared to the entire line. In 1913 the difference was 19 per cent. on freight and 30 per cent. on passengers. This includes inter, trans, and intra state traffic. As the intrastate haul in Arkansas of freight as well as passenger is much shorter than the inter and trans state, the difference in its cost is of course still greater. How this traffic density affects the cost of fuel and wages, the two biggest items of the cost of transportation, is shown by the Company's Exhibit 55.

No allowance is made for the extra cost of intrastate, although the Company's claim, as hereinbefore stated, is that it is considerably more. That it must be more requires no expert's testimony. The more frequent stops and starts, causing damage to the engines and cars; the fact that the local trains have to do their own switching at all intermediate stations, causing a loss of time, for which compensation is made to the train crew; the receipt and delivery of freight in smaller lots, which one of the witness for the Company illustrates by saying:

"If one ton of freight is handled at one station, and five tons at another, the difference in cost is negligible, but when divided between the entire tonnage and mileage, adds considerable to the less. The time taken to load or unload five tons will be nothing like five times as much as receiving or unloading one ton."

Many other matters as shown by the evidence, and hereinbefore mentioned, contribute to the additional cost of local trains when compared to the through, which only receive and deliver freight at terminals in large quantities, with switch engines to do the switching. Still, Mr. Simson makes no allowance whatever for them.

How seriously the shorter haul affects terminal expenses is shown by an illustration made by Mr. Nay when he says:

"If the terminal expense is 30 cents per ton on a haul of 30 miles it will make 1 cent a ton for every mile, while if the haul is 60 miles it will only amount to one-half cent a mile."

This also applies to yard expenses, which are affected by the tonnage handled, depending, to a great extent on the density of traffic. How these expenses vary in different yards is shown by the evidence. The costs in the yards at Fayetteville and Jonesboro were carefully investigated, and it was found that while the rough cost of handling each car at Fayetteville is 14.5 cents, in Jonesboro it is 35 cents, while on the entire system it is 23.2 cents, for a five-year period. Only by ascertaining the actual cost or expense of each yard in the state can the exact cost in the state be found, and this was ascertained by the Company during the two-month test period.

The cost of maintenance of way and structures in Arkansas is shown by the uncontradicted proof to have been, for the four months ending December 31, 1907, $463 per mile, and on the whole system $377, and practically the same proportion is found for the years 1908, 1910, 1911, 1912, and 1913, the greater cost in Arkansas being caused by difference of climatic and topographical conditions, some of the system being operated over a level country without grades, while in Arkansas a large part of it is over river bottoms, and another part in a mountainous section. This is shown by Exhibit 52 of the Company.

The calculations made by Mr. Simson in his Exhibits K1 and Z1 are based only on the four last months of five years on the entire system, while the valuation is that based on the year 1907, the lowest of any year and far below the average. By this method he reduces the percentage of traffic for these periods from 36.98 per cent., which it actually was, to 36.34 per cent., which it was not in fact. Exhibit O of Mr. Simson is based on a formula spoken of as Mr. Douglas', discarded in this case because found to be erroneous by Mr. Simson, and admitted to be so by the Company's accountant. His Exhibit J1 shows the net earnings based on the four last months in 1907 to be 6.62 per cent. Exhibit M1, which is based solely on the last four months for the years ended June 30, 1908, 1910, 1911, 1912, and 1913, shows an average profit of 6.89 per cent., or an average of the two exhibits of 6.75 per cent. In these exhibits, as in all others of Mr. Simson's, no allowance is made, as stated before, for difference in cost, taxes, density of traffic, shorter hauls shown to exist in Arkansas when compared with the entire system, nor any difference in cost between state and interstate, but the road in Arkansas is treated as part of the entire system, and the assumption acted on that the cost is the same on every part of the system, and also for intra and inter state business, an assumption wholly unwarranted, and opposed to all the evidence in the case.

Nor does he make any allowance for decreased earnings, which would have resulted from the State's rates, sought to be enjoined by this action. But adopting his conclusions that the profit of 6.75 per

cent. should be applied to the value of the road in the state of Arkansas, it would show for the intrastate business net earnings $213,767.-16; deduct from this the loss of earnings, if the lower rates which were enjoined had been charged, and which should be deducted, $114,025.93 a year, there is left a net profit from all sources, according to his calculations, the sum of $99,741.23 from intrastate traffic, which would make a small fraction over 3 per cent. on the investment assigned to intrastate traffic, $3,166.921.

Nor do Exhibits AA and BB of the State, which show, the former 7.69 per cent. and the latter 8 per cent. net profit on the valuation, make any distinction in cost between state and interstate, nor allow for the decrease in earnings, which would have resulted from the rates in controversy. But even on that basis, deducting from the intrastate the difference between what was earned and what would have been earned under the lower rates, leaves as a net profit on the intrastate business less than 4 per cent.

The valuations of the road in Arkansas in all calculations made by the court are those agreed on by the State and the Company, and are 27 per cent. less than was claimed by the Company, as shown by the evidence of its chief engineer before the stipulation as to value was made. The reduced valuation was the basis of the exhibits of both parties, as amended, and· which were used as evidence at the hearing and in this opinion.

Mr. Simson found an error in the assignment of earnings to Arkansas made by the Company for the four months ended December 31, 1907, amounting to $23,080.62 for that period. This was caused by the old formula (Douglas' formula) wherein there had been erroneously assigned for the year 1907 $72,107.48 earnings to Tennessee which should have been assigned to Arkansas. The error is admitted, but it only applied to the four-month period in 1907, which is not included in the four-year period used by the court in its calculations, and therefore does not affect them. The learned counsel for the State, in the argument, stated that the court's attention is called to it, not on account of its effect on the result, but to show the error of trying to take one period and transpose it to another.

Claims of other errors in the Company's statistics have been carefully considered by the court, but found to be not sustained by the evidence, or so insignificant in amount that they could not affect the final result to the extent of $^1/_{100}$ of 1 per cent.

A matter of surprise to the court in this case is the fact that the only charge for depreciation made by the Company is one-fourth of 1 per cent. a year on locomotives and rolling stock, and nothing whatever for depreciation of the embankments, ties, rails, bridges, stations, platforms, and property other than locomotives and rolling stock. In the court's opinion this one-fourth of 1 per cent. a year allowed for depreciation of rolling stock is wholly insufficient, as it would indicate the life of the rolling stock to be 400 years, certainly too small, no matter how well kept. But there being no proof of any depreciation except this one-fourth of 1 per cent. none other has been allowed or considered by the court.

In view of the conclusions reached by the court, and what was decided in the Minnesota Rate Case in relation to the Minneapolis & St. Louis R. R. Co., 230 U. S. 469–473, 33 Sup. Ct. 729, 57 L. Ed. 1511, and Norfolk & Western Ry. Co. v. Conley, 236 U. S. 605, 35 Sup. Ct. 437, 59 L. Ed. ——, it is unnecessary to make any other special findings than those made, or to divide between freight and passenger traffic, as the court finds that the rates enjoined yield no profit whatever on the intrastate business, but, on the contrary, show a loss.

As no claim was made for the State, and no evidence whatever introduced to show that the road is not properly and economically managed, or that it was not built to meet a public demand, or what may properly be called a public necessity, the court has assumed that there was no ground for such claims, as otherwise they would have been charged by the able counsel for the State, and evidence to sustain them introduced.

The plaintiff is entitled to a decree making the temporary injunction perpetual.

As conditions may change in the future, which would justify the State to put in force the rates now enjoined, the court will retain jurisdiction of the cause, so that the State may apply for further orders to meet the changed conditions, if desired.