ILLINOIS BELL TELEPHONE CO. v.
MOYNIHAN et al. (CITY OF
CHICAGO, Intervener.)
No. 3746.

District Court, N. D. Illinois, E. D.
January 31, 1930.

Cutting, Moore & Sidley, of Chicago, Ill. (Horace K. Tenney, Wm. D. Bangs and Leslie N. Jones, all of Chicago, Ill., of counsel), for plaintiff.

Samuel A. Ettelson, Corp. Counsel, Haight, Adcock & Banning and Benjamin F. Goldstein, all of Chicago, Ill. (David E. Lilienthal, of Chicago, Ill., of counsel), for City of Chicago.

Oscar E. Carlstrom, Atty. Gen. of Illinois (Wm. C. Clausen, Asst. Atty. Gen., of counsel), for Illinois Commerce Commission.

Before EVANS and PAGE, Circuit Judges, and WILKERSON, District Judge.

EVANS and PAGE, Circuit Judges, and WILKERSON, District Judge.

The bill in this case, filed September 20, 1923, seeks to enjoin, on grounds of confiscation, rates for telephone service prescribed in an order of the Illinois Commerce Commission made on August 16, 1923, and effective October 1, 1923.

The rates now charged are those fixed by the Public Utilities Commission (the predecessor of the Commerce Commission) by order of December 20, 1920. The Commerce Commission instituted proceedings against the plaintiff on September 13, 1921, and by the order here attacked reduced the rates for four classes of coin box service.

The bill alleges that some of the company's property was arbitrarily disregarded in making the valuation, that the valuation is too low, and that certain expenses were improperly rejected. The commission and the city of Chicago, which was permitted to intervene as a defendant, answered the bill. Application for a temporary injunction was made. This was granted on December 21, 1923, after a hearing on affidavits, in which the disputed points were covered at length on both sides. The injunctional order recites that the affidavits are conflicting; that the court is of the opinion that the preliminary injunction should issue because the rates are confiscatory; that the whole matter should go to a final hearing upon evidence to be adduced before the court and not merely upon affidavits; that the court is prepared to set the case down for immediate trial; that a final disposition of the suit on its merits can be made within a few weeks; and that, pending such final hearing, a preliminary injunction should be granted.

The defendants did not avail themselves of the offer of an immediate trial tendered by the court, but elected to appeal to the Supreme Court from the order granting the temporary injunction. That order was affirmed in a memorandum opinion October 19, 1925. Smith v. Illinois Bell Telephone Company, 269 U. S. 531, 46 S. Ct. 22, 70 L. Ed. 397. Plaintiff then moved for a permanent injunction on the pleadings. That motion was denied, the reasons for the ruling being stated in the memorandum filed July 1, 1927. 39 F.(2d) 157.

The order granting the temporary injunction required plaintiff to enter into an undertaking that it would refund to its subscribers the amounts paid by them in excess of the sums chargeable under the order of August 16, 1923. The amounts so reserved for refunds up to January 1, 1929, were as follows: $427,289 for the last quarter of 1923; $1,719,624 for 1924; $1,765,444 for 1925; $1,774,492 for 1926; $1,793,918 for 1927; $1,812,746 for 1928. The exact sum for 1929 is not in the record, but almost $2,000,000 more has been added to the amount which has been accumulated in the reservation for refunds, the entire amount of such reservation being now more than $11,000,000.

Delay in bringing the case to trial is attributable to the city. The company has been ready at all times to proceed. Postponements were sought repeatedly by the city on the ground of change of counsel, lack of preparation, and inability to procure money with which to employ experts. Finally there was a peremptory setting of the case for trial on April 15, 1929. Counsel who now represent the city then came into the case and proceeded with the trial without delay. By agreement the evidence was taken before one of the judges. Hearings were held during a period of approximately two months, and a rec-

ord made consisting of 3,000 pages of testimony and 281 exhibits.

We consider first the city's attack upon the standing of the Illinois Company as the real plaintiff in the case. Ninety-nine per cent. of the stock of the Illinois Company is owned by the American Telephone & Telegraph Company, which owns also substantially the same proportion of the stock of the Western Electric Company. The Illinois and American Companies unite in rendering long-distance service under an arrangement for division of tolls. At the time of this inquiry, October 1, 1923, there was in effect an agreement by which the Illinois Company paid to the American Company 4½ per cent. of its gross revenues for rent of instruments and as compensation for engineering, executive, financial, and other services. A large part of the materials entering into the construction of the plant and equipment of the Illinois Company were purchased from the Western Electric Company and much of its operating expense consisted of payments made under a contract with that company for apparatus and supplies.

The American Company, at the time in question, owned a controlling interest in 15 telephone companies which, in connection with other companies controlled by those subsidiaries and some companies in which its interest was not controlling, were and now are operated as a system with the avowed purpose of rendering a nation-wide and unified telephone service. "The Associated Companies," the American Company says, "are specialists in local service problems, with local operating forces identified and familiar with the needs of the communities they serve. The parent Company undertakes the solution of the problems that are common to all." In this way, it is said there is provided a central authority equipped to perform adequately general functions, leaving to the local companies responsibility for local affairs.

■■ The city urges that, in bringing about this unified service, the American Company has exercised its control in such a way as to destroy the corporate identity of the Illinois Company, with the result that either the suit must fail for lack of the real plaintiff or, if permitted to stand, must be tried as if the American Company were the party before the court. "The Illinois Company," it is said, "is a mere agency or instrumentality of the American Company." The stock ownership gives to the American Company power to control the Illinois Company through the election of directors. This power, in itself, however, does not make the American Company the one which is operating the local public utility. It does not have the effect of destroying the separate corporate identity of the local company. The stock ownership does not give authority to dictate the acts of the directors of the local company; and, against accusations of fraud and misconduct, it will be presumed that the directors have performed their official duties honestly, and have acted in good faith with respect to the corporation of whose affairs they are in charge and the public to which it gives service. Pullman Palace Car Co. v. Missouri Pacific Co., 115 U. S. 587, 596, 6 S. Ct. 194, 29 L. Ed. 499; Porter v. Pittsburgh Bessemer Steel Co., 120 U. S. 649, 670, 7 S. Ct. 741, 30 L. Ed. 830; Peterson v. Chicago, Rock Island & Pacific Ry., 205 U. S. 364, 383, 27 S. Ct. 513, 51 L. Ed. 841; Houston v. S. W. Bell Tel. Co., 259 U. S. 318, 323, 42 S. Ct. 486, 66 L. Ed. 961; Missouri ex rel. S. W. Bell Tel. Co. v. Public Service Commission of Missouri, 262 U. S. 276, 288, 289, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807; Indiana Bell Telehone Co. v. Public Service Com. (D. C.) 300 F. 190, 204; Northwestern Bell Telephone Co. v. Spillman (D. C.) 6 F.(2d) 663.

■ Courts, of course, will look through form to substance. Where the power of stock ownership is so exercised as to commingle the affairs of the corporations and make them practically one, courts will not permit themselves "to be blinded or deceived by mere forms of law but, regardless of fiction, will deal with the substance of the transaction involved as if the corporate agency did not exist and as the justice of the case may require." U. S. ex rel. Atty. Gen. v. Delaware & Hudson Co., 213 U. S. 366, 29 S. Ct. 527, 53 L. Ed. 836; C., M. & St. P. Ry. Co. v. Minneapolis Civic & Commerce Association, 247 U. S. 490, 38 S. Ct. 553, 557, 62 L. Ed. 1229.

■ It must not be overlooked that the order of the commission here involved is directed against the Illinois Company. The commission did not find that the corporate identity of the Illinois Company had been destroyed. It was treated as a corporation for the purpose of compelling it to establish the prescribed rates for service furnished by the operation of the property to which it has the legal title. It is not a fair application of the rule invoked by the city to say that the order of the commission may be enforced against the Illinois Company, as a corporate entity, and that the company then loses its corporate character when it attempts to show that the

commission's order is confiscatory. Moreover, the commission, in establishing the rates complained against, did not deal with the business of the Illinois Company as an integral part of the business of the American Company. The city maintains that the question to be determined is: "What is a fair return to the investors who have placed their investment in the American Telephone and Telegraph Company, the real operator of the Chicago property in so far as the local property and the local use is concerned?" The commission did not proceed on that theory. The commission did not make an investigation of the business of the American Company for the purpose of fixing rates for that company. If the position now taken by the city is correct, the method pursued by the commission is fundamentally erroneous, and its order is void. Northern P. R. Co. v. Department of Public Works, 268 U. S. 39, 43, 45 S. Ct. 412, 69 L. Ed. 836; Chicago, M. & St. P. Ry. Co. v. Public Utilities Commission, 274 U. S. 344, 351, 47 S. Ct. 604, 71 L. Ed. 1085.

The city's contention that the American Company has abused its power of stock ownership and has dominated and controlled the officers and directors of the Illinois Company, with the result that they exercise no will of their own, and the Illinois Company is reduced to a mere agency or instrumentality of the American Company, is not sustained by the evidence. This evidence includes the annual reports of the American Company from 1881 to date, a selection of bulletins, circulars, and letters sent by the general staff of the American Company, and some oral testimony as to alleged instances of dictation. The evidence shows a co-ordination of activities with a view to producing an efficient, unified service. The plan of organization, the ownership of property, and the method of operation show that the American and Illinois Companies functioned in distinct fields of activity. At no time have more than three of the eleven directors of the Illinois Company been officers of the American Company. The charges of neglect of duty and breach of trust against the directors necessarily implied in the assertion that the Illinois Company has lost its corporate identity are unsustained by proof. We do not find anything in the long record on this branch of the case which furnishes a sufficient reason for departing from the general rule applicable to transactions between companies related through stock ownership as are the American and Illinois Companies. That rule is stated by the Supreme Court in a case (Houston v. S. W. Bell Tel.

Co., 259 U. S. 318, 323, 42 S. Ct. 486, 488, 66 L. Ed. 961), involving the American Company, the Western Electric Company, and the Southwestern Bell Telephone Company, another subsidiary of the American Company, as follows:

"The American Telegraph & Telephone Company owns substantially all of the stock of the Company and a large majority of the stock of the Western Electric Company. From the American Telegraph & Telephone Company the Company leases its instruments and secures their maintenance and renewal and from the Western Electric Company it obtains the greater part of its equipment and supplies used in operating its local exchange. It is contended by the City that no fair disclosure was made of the profits made by the furnishing companies on the instruments and on the material and supplies so furnished, and that, for this unique reason, the company should not be heard in a court of equity and the case should be dismissed. It is true that the company did not introduce proof to show what the profits of the two companies were, either upon the business done with it or on their entire business but it did introduce much evidence tending to show that the charge made and allowed for the services rendered and supplies furnished by them was reasonable and less than the same could be obtained for from other sources. Under the circumstances disclosed in the evidence, the fact that the American Telegraph & Telephone Company controlled the Company and the Western Electric Company by stock ownership is not important beyond requiring close scrutiny of their dealings to prevent imposition upon the community served by the Company. * * * *"

And in United Fuel Gas Co. v. Railroad Commission, 278 U. S. 300, 320, 321, 49 S. Ct. 150, 156, 73 L. Ed. 390, it is said:

"We need not labor the point that a public service corporation may not make a rate confiscatory by reducing its net earnings through the device of a contract unduly favoring a subsidiary or a corporation owned by its own stockholders. Cf. Chicago & Grand Trunk Ry. Co. v. Wellman, 143 U. S. 339, 345, 12 S. Ct. 400, 36 L. Ed. 176. We recognize that a public service commission, under the guise of establishing a fair rate, may not usurp the functions of the company's directors and in every case substitute its judgment for theirs as to the propriety of contracts entered into by the utility; and common ownership is not of itself sufficient ground for disregarding such intercorporate agreements when it appears that, although an

affiliated corporation may be receiving the larger share of the profits, the regulated company is still receiving substantial benefits from the contract and probably could not have secured better terms elsewhere. Missouri ex rel. Southwestern Bell Telephone Co. v. Public Service Comm., 262 U. S. 276, 288, 43 S. Ct. 554, 67 L. Ed. 981, 31 A. L. R. 807; Houston v. Southwestern Telephone Co., 259 U. S. 318, 42 S. Ct. 486, 66 L. Ed. 961."

█ The Illinois Company is to be treated as the real plaintiff in this case. While agreements with the American Company, so far as they affect the question of confiscation, are to be scrutinized carefully, they are not to be rejected as shams; nor may findings of the commission as to what would be fair and reasonable contracts be substituted for them, unless it appears they were made in bad faith and as a device for unduly enhancing the earnings of the American Company at the expense of the Illinois Company.

Another preliminary question which should be disposed of before passing to questions of earnings and value relates to the separation of plaintiff's interstate property, revenue, and expenses and the division of long-distance tolls with the American property.

The property of plaintiff in Chicago is used to render: (a) Exchange service all of which is intrastate; (b) intrastate toll service over its own lines and under arrangements with other companies than the American; (c) interstate toll service, which includes all the toll service rendered under arrangements with the American Company. The commission, in making the order complained against, dealt with plaintiff's Chicago property and business as an entirety. No separation of interstate property and business was made by the company, and the commission's order which covered exchange service in Chicago was based upon a valuation of all of plaintiff's Chicago property and a consideration of its total Chicago revenues and expenses.

█ The Illinois Company owns and operates all the property in the city of Chicago used in interstate calls, and connects with the property owned by the American Company at the city limits of Chicago. This part of the business of the Illinois Company is interstate commerce. Public Utilities Commission of Rhode Island v. Attleboro Steam & Electric Co., 273 U. S. 83, 47 S. Ct. 294, 71 L. Ed. 549; South Covington & Cincinnati St. Ry. Co. v. City of Covington, 235 U. S. 537, 35 S. Ct. 158, 59 L. Ed. 350, L. R. A. 1915F, 792.

Following the rule stated in the Minnesota Rate Cases, plaintiff, which is attacking as confiscatory the order of a state commission, has made a showing not only upon the basis stated in the commission's order, but upon the basis of intrastate business alone. As the commission's order dealt directly with exchange rates only, plaintiff has also made a showing as of June 30, 1923, in which all toll business both interstate and intrastate is eliminated. The accuracy of these computations cannot be questioned, if the principles on which they are made are correct. They show a larger rate of return upon the property used when all the business is considered than is shown when either the interstate or the entire toll business is eliminated. The case, therefore, is presented in its least favorable aspect as to plaintiff's claim of confiscation by following the method adopted by the commission and making no separation of toll business, either interstate or intrastate. According to these computations, one-half of 1 per cent. of calls originated by subscribers resulted in interstate toll calls, 3.62 per cent. of plaintiff's property in Chicago was used in furnishing interstate toll service, and 2.54 per cent. of its property was used in furnishing intrastate toll service. The per cent. of return at the rates now in force shown on plaintiff's claimed reproduction cost new was 4.32 per cent. for total Chicago business, 4.15 per cent. for total intrastate business, and 3.97 per cent. for intrastate exchange business. The per cent. of return shown on plaintiff's claimed original cost was 6.23 per cent. for total Chicago business, 5.99 per cent. for total intrastate business, and 5.74 per cent. for intrastate exchange business. The difference, therefore, assuming the correctness of plaintiff's method, will not affect the result, and may be disregarded for the purposes of this case.

The defendants claim, however, that the basis of separation was erroneous, and did not include a sufficient amount of the company's property as used in interstate commerce. They assert that in the proportion assigned to the interstate use there should be included an item covering the use of the exchange property; that is to say, the use of that property from the subscriber's station to the toll board. The method employed by the company was upon the basis of use from the toll switchboard and no portion of the property from the subscriber's station to the toll trunks was considered as interstate commerce. Defendants have neither shown nor stated the amount to be added on account of

the alleged interstate use of exchange property, but that it cannot affect the result in this case will be evident hereafter, if it is borne in mind that, as above stated, only one-half of 1 per cent. of calls originated by subscribers resulted in interstate calls.

■ The separation of interstate from intrastate business is a difficult problem which the courts recognize and do not require exactness of proof. A separation made upon a reasonable basis will be approved, and this is particularly true where those opposing it adopt a purely negative attitude and offer no affirmative evidence. Rowland v. Boyle, 244 U. S. 106, 37 S. Ct. 577, 61 L. Ed. 1022; Groesbeck v. Duluth, S. S. & A. Ry. Co., 250 U. S. 607, 40 S. Ct. 38, 63 L. Ed. 1167; Boyle v. St. Louis & S. F. R. R. Co. (D. C.) 222 F. 539; Southern Bell Telephone Co. v. Railroad Commission of South Carolina (D. C.) 5 F.(2d) 77; Queens Borough Gas & Electric Co. v. Prendergast (D. C.) 31 F.(2d) 339; New York Telephone Company v. Prendergast (D. C. Southern District of New York), decided November 7, 1929. 36 F.(2d) 54.

■ The toll rates filed by the company provided:

"The service covered by these tariffs consists in furnishing for the use of patrons facilities, other than exchange facilities, intended for use in telephonic communication between the points listed. The exchange facilities used in connection with this service are the facilities required to establish connection between an exchange station and the toll board, or between an exchange station and the toll trunks, when such trunks are employed to effect connection with the toll board, and the use of such facilities is covered by the charges for exchange service."

This provision in the schedules and the method followed by the company in making the separation are in accord with the rulings of the courts and commissions which have considered this subject. Re Rock County Farmers Telephone Co., P. U. R. 1925-A 178; Public Utilities Com. v. New England Telephone & Telegraph Co., P. U. R. 1926-C 207, 261; Pacific Co. v. Whitcomb (D. C.) 12 F.(2d) 279; New York Telephone Co. v. Prendergast (D. C.) 300 F. 822, 826, 827, and same case on final hearing, supra (D. C.) 36 F.(2d) 54. In Houston v. Southwestern Bell Telephone Company, 259 U. S. 318, 323, 42 S. Ct. 486, 66 L. Ed. 961, the Supreme Court considered the partial separation of the interstate property, but an examination of the facts of that case shows that it does not sustain defendants' theory of including exchange property as interstate property.

The method followed by the Illinois Company in making a separation of its interstate property is a reasonable one, and is approved.

■ Defendants attack the fairness of the division of interstate tolls between the American and Illinois Companies. If the interstate business of the Illinois Company is excluded in determining the issue of confiscation, it is not necessary, obviously, to consider the question of the division of interstate tolls. If the issue of confiscation is to be determined upon a consideration of the entire Chicago business of the Illinois Company, we should examine the objections made to the division of interstate tolls. Those tolls were divided under an arrangement by which the American Company paid an originating commission of 17 cents per message, and, in addition thereto, the actual cost of operation of the toll switchboard and the toll lines plus 10 per cent. for overhead and a 10 per cent. return on the book cost thereof. All these payments resulted in the Illinois Company retaining from 45 to 49 per cent. of the total gross of the originating long-distance tolls. The originating commission of 17 cents was a greater commission than that paid by the Illinois Company to the several hundred independent companies with which it connects in the state of Illinois. The originating commission for the year 1923 was $363,000. As a result of this arrangement, the Illinois Company was earning 12.64 per cent. on the book cost of its interstate toll property, while the return on its exchange property was only 5.74 per cent. on book cost. This division of the tolls appears to be fair and reasonable. There is no proof of abuse of discretion or fraud in making it. The sinister inference which the city seeks to have drawn from certain changes in the arrangement is not warranted by the facts. A close scrutiny of the arrangement does not disclose any reason why it should be rejected in determining the revenues of the Illinois Company or why the company should be charged with additional earnings on the theory that the division was unfair and more should have been collected from the American Company than was, in fact, received. Chesapeake & Potomac Telephone Company v. Whitman (D. C.) 3 F.(2d) 938, 957.

We determine, therefore, the issue of confiscation on the basis of the total Chicago property of plaintiff. We do this for the

reason that, as pointed out above, that basis is less favorable to the plaintiff than that of its total intrastate property or its intrastate exchange property. The commission proceeded on the basis of total Chicago property, and it will be more convenient to examine the order without recasting the figures to make allowances for interstate or intrastate toll property and earnings which cannot affect the result.

We consider first the questions relating to revenues and expenses and then those relating to value.

■ The company's showing of revenues and expenses for 1923 is as follows:

Company and the Chicago Company have increased their telephone rates to a considerable extent within this period of time. The Commission believes that this matter should be fully investigated and an equitable adjustment made to the end that a greater part of the toll charges be paid to the Illinois Bell Telephone Company. There are not sufficient facts in this record to permit of making a proper adjustment and in this order the Commission will estimate revenues from such source on the basis now in effect."

Divisions of rates are primarily a matter for the consideration of the Interstate Commerce Commission and the state commission.

| | Actual First Seven Months 1923 | (a) Computed on an Annual Basis at Actual Rate of First Seven Months 1923 | Actual Year 1923 |
|---|---|---|---|
| Exchange Revenues | $21,102,900 | $36,176,400 | $36,342,226 |
| Toll Revenues | 1,699,882 | 2,914,084 | 3,042,994 |
| Miscellaneous Operating Revenues | 370,725 | 635,528 | 673,049 |
| Non-Operating Revenues | 337,106 | 577,896 | 760,966 |
| Gross Revenues | $23,510,613 | $40,303,908 | $40,819,235 |
| Less: Licensee Revenue—Dr. | 1,008,958 | 1,729,643 | 1,724,251 |
| Total Revenues | $22,501,655 | $38,574,265 | $39,094,984 |
| Traffic Expenses | 7,609,294 | 13,044,504 | 13,192,673 |
| Commercial Expenses | 2,405,983 | 4,124,542 | 4,202,273 |
| General and Miscellaneous Expenses | 684,105 | 1,172,751 | 1,063,194 |
| Current Maintenance | 3,273,440 | 5,611,613 | 5,901,733 |
| Depreciation | 2,495,127 | 4,277,360 | 4,480,954 |
| Taxes | 2,182,187 | 3,740,892 | 3,670,347 |
| Other Expenses and Deductions | 195,179 | 334,592 | 303,980 |
| Total Expenses | $18,845,315 | $32,306,254 | $32,815,154 |
| Balance available for Return | $ 3,656,340 | $ 6,268,011 | $ 6,279,830 |

We have already considered the claim of defendants that the item for toll revenues should be increased because the division of tolls with the American Company is unfair. This item was accepted by the commission in the order complained against. The commission said:

"The record shows that the 17 cents commission was determined in 1910 from a study made at that time of the cost of performing this service. Since that date the cost of operation and cost of plant has increased, and the record also shows that both the American

We find no valid reason in the record before us for modifying the item of toll revenues.

■ The deduction on account of licensee revenue paid to the American Company is attacked by defendants on the ground of unfairness of the 4½ per cent. contract. That contract provided for a payment of 4½ per cent. of plaintiff's gross revenue for rental of telephone instruments, and for advice and assistance in engineering, operating, financial, and other matters, and for the prosecution of experimental and research work in

telephony for the benefit of the entire system.

The order of the Public Utilities Commission made December 20, 1920, which fixed the rates charged in 1923, and still in force under the temporary injunction, limited the amount to be charged as an operating expense under this contract. The order of the commission provided that an allowance of $1.13 was reasonable solely for the use of each telephone instrument; that the license to use patented devices, together with engineering, financial, and advisory services, were of value to the Illinois Company; that the payment made under the license contract then averaged $2.10 per station per annum for the city of Chicago; and that, inasmuch as the American Company owned 98 per cent. of the stock of the Illinois Company, it was necessary that the underlying contract be given strict scrutiny, notwithstanding the fact that the local company, as a legal entity, was a free agent. It was further held that the evidence disclosed the unquestioned value of the contract; that, while it was difficult, if not impossible, to evaluate such services, it was to be assumed that the executive officers of the Illinois Company had taken into consideration the probable expense that would have been incurred in making any equally satisfactory alternative arrangement; that a similar payment by the Central Union Telephone Company had been sustained in the Illinois courts; that the making of the contract was a matter of financial arrangement; that the commission was not the financial manager of the corporation, and could not ignore items charged by the utility as operating expenses, unless there was an abuse of discretion by the corporate officers—citing Springfield Gas Case, 291 Ill. 209, 234, 125 N. E. 891. It was there stated:

"Criticism as to the method of payment, insofar as it is dependent upon a percentage of gross revenues might be sustained owing to the increase in the annual payment when gross revenues are for any reason increased. The particular amounts involved have been approved as items of operating expense in different jurisdictions by nine Commissions within the last three years, however, and the Commission * * * finds that the present annual payment under the license contract, limited to $2.10 per station for the City of Chicago * * * is not excessive and may be allowed as an item of operating expense."

The Commerce Commission in the order complained against, after reciting the facts as to the relationship between the two companies, stated that the services rendered under the license contract and the cost thereof should be fully investigated at some time to the end that charges for service may be fully established. The order then provided:

"The present record does not contain sufficient evidence to warrant the Commission in departing from the findings of the previous Commission * * *. The previous Commission found that payment * * * of $2.10 per station was sufficient to cover the value of the services rendered."

Plaintiff put in force the rates prescribed by the order of December 20, 1920. Those rates may have been nonconfiscatory at that time by reason of other findings as to valuation and operating expenses, even though the attempt to limit payment under the license contract may have been erroneous. Plaintiff, by accepting those rates, did not estop itself from claiming as a proper operating expense, when attacking as confiscatory the subsequent order of the Commerce Commission, the full amount paid under the license contract. (See opinion of this court denying plaintiff's motion for judgment on the pleadings.)

The amount paid under the license contract was $1,724,251, of which approximately $850,000 represented services and the balance rentals. The record here does not warrant any reduction of the amount found reasonable by both commissions for rentals. The case for the allowance of the entire amount for services is a strong one. We have already found that the record does not show an abuse of the power of stock ownership which operates to destroy the corporate identity of plaintiff. The stock ownership is not important beyond requiring close scrutiny of the contract. It is not incumbent on plaintiff to show the cost of the services to the American Company. The test is the nature of the benefits received by plaintiff and whether or not it probably could have secured better terms elsewhere. Houston v. Southwestern Bell Telephone Co., supra; Missouri ex rel. S. W. Bell Telephone Co. v. Public Service Commission of Missouri, supra; United Fuel Gas Co. v. Railroad Commission, supra; Indiana Bell Telephone Co. v. Public Service Commission, supra; Northwestern Bell Telephone Co. v. Spillman (D. C.) 6 F.(2d) 663.

The reduction which must be made if the finding of the commission as to the license contract is followed is $360,000. The reduction of operating expenses and consequent increase in amount available for return by that amount cannot possibly change the re-

sult, in view of our rulings on other branches of the case.

The position of the city that either the entire $850,000 paid for service under the contract should be rejected or that it should be reduced by an amount larger than that stated by the commission is untenable on this record. Accordingly, in determining the issue of confiscation, we shall make the allowance of $1,364,000 found reasonable by the commission for operating expense on account of payments under the license contract.

Defendants urge that the charge of $4,-480,954 by plaintiff for expense of depreciation is excessive by $1,800,000 as claimed by the commission, or $2,200,000 as claimed by the city. That question will be considered in connection with the questions presented as to the valuation of the property. Some other objections are made by the city to expense items, but we do not regard any of them as substantial or important.

With the exception of the expense of depreciation, reserved for consideration with valuation questions, and the deduction of $360,000 from the payment under the license contract, plaintiff's statement of revenues and expenses for 1923 is found to be substantially correct.

The findings of the commission as to valuation and expense of depreciation are as follows:

"The original cost as of Dec. 31, 1922, of the property used and useful in the rendering of telephone service in the City of Chicago and exclusive of working capital, material and supplies, work in progress and going value, but including overhead is $90,687,-816.

"The reproduction cost new of the property used and useful in the rendering of telephone service in the City of Chicago, exclusive of working capital, material and supplies, work in progress and going value, but including overhead as of Dec. 31, 1922, is $128,769,000.

"The property as it now exists is in at least 90 per cent. condition.

"The amount of construction work in progress that will eventually be included in capital account is not more than $4,250,000.

"The amount necessary to provide a sufficient cash working capital and permit of carrying sufficient materials and supplies for the efficient conduct of telephone business in the City of Chicago is $3,000,000.

"The going value of the Chicago property of the Illinois Bell Telephone Company is $4,196,872.

"The Chicago division of the Illinois Bell Telephone Company has a depreciation reserve of $26,000,000, all of which has been contributed by the subscribers of this Company, which sum has been used by the said Company for extensions and additions to its property, and the extensions and additions paid for from such moneys should not be considered in arriving at a base upon which to compute rates for telephone service.

"The fair rate making base for the Chicago property of the Illinois Bell Telephone Company, including physical property, overheads, working capital, going value and work in progress, as hereinabove found is $96,000,-000 and is exclusive of the $26,000,000 of money taken by the Company for depreciation reserve and put in plant and equipment.

"A fair allowance to take care of maintenance and retirement charges for said property in use as of December 31, 1922, is $7,-869,400, and that sum plus 8¾% of all additions and betterments will be sufficient and adequate to permit the Illinois Bell Telephone Company to properly maintain its Chicago property."

Defendants invoke in support of these findings the rule that the burden is on plaintiff in a confiscation case to show legal inadequacy by clear and convincing evidence, and that there is a strong presumption in favor of the legal adequacy of the commission's order. United Fuel Gas Co. v. Railroad Commission, supra; Darnell v. Edwards, 244 U. S. 564, 569, 37 S. Ct. 701, 61 L. Ed. 1317.

█ The exclusion from the rate base of extensions and additions to the amount of $26,000,000 paid for from the depreciation reserve was clearly erroneous. The just compensation safeguarded to the utility by the Fourteenth Amendment is a reasonable return on the value of the property used at the time it is being used for the public service. Constitutional protection against confiscation does not depend on the source of the money used to purchase the property. It is enough that it is used to render the service. The customers are entitled to demand service, and the company must comply. The company is entitled to just compensation, and, to have the service, the customers must pay for it. The relation between the company and its customers is not that of partners, agent and principal, or trustee and beneficiary. The revenue paid by the customers for service be-

longs to the company. The amount, if any, remaining after paying taxes and operating expenses, including the expenses of depreciation, is the company's compensation for the use of its property. If there is no return, or if the amount is less than a reasonable return, the company must bear the loss. Past losses cannot be used to enhance the value of the property or to support a claim that rates for the future are confiscatory. And the law does not require the company to give up for the benefit of future subscribers any part of the accumulations for past operations. Profits of the past cannot be used to sustain confiscatory rates for the future. Customers pay for service, not for the property used to render it. Their payments are not contributions to depreciation or other operating expenses or to the capital of the company. By paying bills for service, they do not acquire any interest, legal or equitable, in the property used for their convenience or in the funds of the company. Property paid for out of moneys received for service belongs to the company just as does that purchased out of proceeds of its bonds and stock. Board of Public Utilities Commissioners et al. v. New York Telephone Company, 271 U. S. 23, 31, 32, 46 S. Ct. 363, 70 L. Ed. 808.

The commission, in defense of its order, now asserts that the deduction of $26,000,000 was proper as representing the deduction to be made on account of depreciation in valuing the property, despite the fact the order specifically finds that the property was in 90 per cent. condition. But, if the basis on which the $26,000,000 was accumulated is the correct basis for measuring depreciation, then the order is clearly erroneous in reducing by $1,800,000 the allowance for expense of depreciation. It is inconceivable on any theory consistent with equity and fair dealing that both acts of the commission can be right. If, indeed, the unreasonable and arbitrary method of the commission in handling depreciation and property paid for out of the reserve does not make its order void (Northern P. R. Co. v. Department of Public Works, supra; Chicago, M. & St. P. Ry. Co. v. Public Utilities Commission, supra. Compare United Fuel Gas Co. v. Railroad Commission, supra), it certainly operates to destroy any presumption which may have existed in its favor.

As to original cost, the company and the commission agree that the original cost as of June 30, 1923, was $101,626,014. This is the commission's finding of cost as of December 31, 1922, plus net additions to June 30, 1923. The city claims that the plant account upon which the commission made its finding was inflated, and that there is no proper basis in the record for determining original cost. A large part of purchases entering into plant account were made from the Western Electric Company. The city has failed to support its contention that exorbitant prices were paid to the Western Electric Company. It appears that the average profit for the last fourteen years of the Western Electric Company on its total business has not been in excess of 7 per cent. and never above 10 per cent. The evidence does not support a finding that in the transactions with the Western Electric Company there was an abuse of the discretion of the directors and officers of the Illinois Company which constitutes either a fraud or an injury to the public. Other objections of the city go to the alleged lack of integrity of the plant account through failure to credit retirements, the method by which retirement costs were determined, and the method of handling reused material. Those objections are not sustained by the record, and are without substantial merit. The record shows original cost as of June 30, 1923, to be $101,626,014.

As to reproduction cost, the commission found the reproduction cost new, exclusive of working capital, materials and supplies, work in progress and going value, but including overheads, as of December 31, 1922, was $128,769,000. There is no rational basis in the record for that finding, unless there is added $8,292,869, the amount of the net additions for the year 1922, which was obviously overlooked by the commission in making its finding. There should also be added the net additions from January 1, 1923, to June 30, 1923, amounting to $9,938,198. This makes the reproduction cost new as of June 30, 1923, approximately $147,000,000. The evidence of the company is that the reproduction cost new of the property as of June 30, 1923, was $145,248,344. The city, dissenting again from the findings of its codefendant, the commission, has devoted a large part of its evidence to objections to the method by which the company's claim of value was established.

No field inventory or appraisal was made. The property of the company had been appraised in 1911, and this appraisal was taken as the starting point. Factors were applied to this appraisal and the net additions thereto representing the actual increases, respectively, of the prices of labor and material entering into the construction of the property from year to year to June 30, 1923. It is

claimed by plaintiff that the cost of reproducing the property new as of June 30, 1923, would be at least the amount determined by the appraisal made as above stated. Stress is placed upon the well-known facts concerning increase in labor and material costs during and after the World War, of which the court will take notice, and the increasing difficulties of construction which would have been met by a reproduction of the entire property under conditions existing in Chicago in 1923. Assuming the correctness of the 1911 inventory and appraisal and the accuracy of the company's books and conversion factors, we see no reason why the appraisal of June 30, 1923, does not furnish a reasonably accurate basis for determining a minimum reproduction cost. The same method of appraisal based upon actual construction costs of the company was used in its proceedings before the Public Utilities Commission and before the Illinois Commerce Commission, both of which commissions determined the reproduction cost new of the company's property on the basis of these appraisals.

The testimony of the plaintiff's engineers and accountants satisfies us that the computations are based upon data which are substantially correct. It has not been met, in our opinion, by the criticism of the expert witnesses produced by the defendants. Those criticisms are weakened by the conflicting statements of the witnesses and the contradictions found in correspondence and testimony in other cases. While under some circumstances this method might not be a reliable guide to true reproduction costs, we think that for this plant, and with this company's books and supporting data, it shows clearly that the reproduction cost new of the physical property as of June 30, 1923, was at least $145,000,000.

■ Plaintiff asserts that the allowance by the commission of $4,196,067 for going value is inadequate. This was the amount found by the Public Utilities Commission in arriving at its minimum value of the company's property in 1919—about 4 per cent. of the reproduction cost. If the same percentage is applied to the reproduction cost in 1923, the allowance for going value is increased to $5,800,000. The commission, in determining going value, rejected from consideration items aggregating more than $5,000,000 on the ground that they had been charged to operating expense and the company reimbursed therefor. The method followed by the commission is questioned by plaintiff. Lincoln Gas & Electric Company v. City of Lincoln, 250 U. S. 256, 39 S. Ct. 454, 63 L. Ed. 968;

Board of Public Utility Commissioners v. New York Telephone Company, 271 U. S. 23, 46 S. Ct. 363, 70 L. Ed. 808.

The city's claim that there should be no allowance for going value cannot be sustained on the record in this case. McCardle v. Indianapolis Water Co., 272 U. S. 400, 414, 47 S. Ct. 144, 71 L. Ed. 316; Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 165, 35 S. Ct. 811, 59 L. Ed. 1244; Denver v. Denver Union Water Co., 246 U. S. 178, 191, 38 S. Ct. 278, 62 L. Ed. 649. It is not necessary, in determining the issue of confiscation here, to do more than to find that $4,196,067, the amount allowed by the commission, is the minimum allowance which can be made for going value.

■ As to the deduction for depreciation in the valuation of the property, only two possible bases are found in the record. The one is the contention of the company, supported by the evidence and the finding of the commission, that the property is in 90 per cent. condition. This results in a deduction of $14,500,000, making the reproduction cost new, less depreciation, $130,500,000. The other basis is to accept the claim of the defendants that $26,000,000, the entire amount of the property paid for from the depreciation reserve and eliminated by the commission from its valuation of the property, should be deducted. This makes the reproduction cost new, less depreciation, $119,000,000.

If the first basis for estimating depreciation is accepted, we have the following elements to which consideration must be given in determining the rate base: Original cost, $101,600,000; reproduction cost new of physical property, less depreciation, $130,500,000; working capital, $3,000,000; going value, $4,200,000.

The valuation of $96,000,000 found by the commission, as of December 31, 1922, or $106,000,000 as of June 30, 1923, if the net additions from January 1, 1923, to June 30, 1923, are added, is clearly insufficient, and shows that proper consideration was not given to the element of reproduction cost new: St. Louis & O'Fallon R. Co. v. U. S., 279 U. S. 461, 484, 49 S. Ct. 384, 73 L. Ed. 798; McCardle v. Indianapolis Water Co., 272 U. S. 400, 410, 411, 47 S. Ct. 144, 71 L. Ed. 316; Bluefield Water Works & Improvement Co. v. Public Service Commission, 262 U. S. 679, 691, 692, 43 S. Ct. 675, 67 L. Ed. 1176; Missouri ex rel. Southwestern Bell Telephone Co. v. Public Service Commission, supra.

Certainly a valuation of less than $125,000,000 (estimating the depreciation at 10

per cent.) would amount to confiscation. The amount available for return in 1923 under the rates in force, on the company's showing, was $6,280,000. If to this is added $360,000 deduction from the payment under the license contract and $1,800,000, the commission's deduction from allowance for the expense of depreciation, there would be available for return $8,440,000. The reduction for an entire year under the rates established by the commission would have been $1,700,000, leaving $6,740,000 available for return. This is a return of less than 5½ per cent., and clearly confiscatory under conditions existing in 1923. McCardle v. Indianapolis Water Co., supra, 272 U. S. 419, and cases cited in note 4, 47 S. Ct. 144, 71 L. Ed. 316; United Railways & Electric Co. v. West, 50 S. Ct. 123, 74 L. Ed. ——, decided by United States Supreme Court January 6, 1930.

If the entire $26,000,000, is deducted for depreciation, there would be a corresponding reduction in the rate base to $113,500,000. But the company is not to be subjected to an arbitrary rule by which it is charged with the full depreciation reserve in valuing its property and denied the benefit of making the yearly charge entering into that reserve as an expense of depreciation. On that basis the deduction of $1,800,000 from the expense of depreciation is unwarranted, and the amount available for return under the rates fixed by the commission would be $4,940,000. This is a return of less than 4½ per cent.

We are not to be understood as approving the deduction of $360,000 from the payment under the license contract or that of $1,800,000 from the expense of depreciation, or of holding that the evidence does not warrant a higher valuation than $125,000,000. We have not undertaken to decide disputed questions where it is apparent that, in the view most favorable to the defendants, the return to the company would still be inadequate. Denver v. Denver Union Water Co., 246 U. S. 178, 194, 38 S. Ct. 278, 62 L. Ed. 649.

The defendants assert that the plaintiff does not come into equity with clean hands. The record does not sustain the accusations made in support of that charge.

The order was made in 1923. Since that time the commission has taken no steps to examine the matters reserved in the order for further consideration or to determine a rate base by a method which is not, on its face, unreasonable and arbitrary. The defendants have sought repeated delays and attempt to take advantage of them by projecting the effect of the order of 1923 to a time when changed conditions require another investigation by the commission, if new rates are to be established. The finding of confiscation in 1923 applies with increasing force to the succeeding years. Considering the attitude of the defendants as to the trial of the case and the effect of a decree for the defendants, a court of equity will scrutinize this record with great care before making an order which will require the plaintiff to refund more than $11,000,000.

The case, however, does not appear to us to be a doubtful one, even on assumptions as favorable to the defendants as it is reasonably possible to make, and the temporary injunction is made permanent.