ILLINOIS BELL TELEPHONE CO. v. GILBERT et al. (CITY OF CHICAGO, Intervener).

No. 3746.

District Court, N. D. Illinois, E. D.

April 29, 1933.

,mission which prescribed rates for telephone service in the city of Chicago upon the ground that the order was confiscatory. Illinois Bell Tel. Co. v. Moynihan, 38 F.(2d) 77. The order of the Commission was made on August 16, 1923, effective October 1, 1923. The decree of January 31, 1930, was set aside by the Supreme Court and the cause remanded to this court. Smith v. Illinois Bell Tel. Co., 282 U. S. 133, 51 S. Ct. 65, 75 L. Ed. 255. The Supreme Court said that "there should be appropriate findings as to the results of the intrastate business in Chicago and the effect of the rates in question for each of the years since the date of the Commission's order."

As to the separation of the intrastate and interstate property, revenues and expenses of the company, the Supreme Court (page 149 of 282 U. S., 51 S. Ct. 65, 69) said: "In view of the questions presented in this case, the validity of the order of the state commission can be suitably tested only by an appropriate determination of the value of the property employed in the intrastate business and of the compensation receivable for the intrastate service under the rates prescribed * * *. As to the value of that property, and as to the revenue and expenses incident to that business, separately considered, there should be specific findings * * *."

And again on the same subject: "In the method used by the Illinois Company in separating its interstate and intrastate business, for the purpose of the computations which were submitted to the court, what is called exchange property, that is, the property used at the subscriber's station and from that station to the toll switchboard, or to the toll trunk lines, was attributed entirely to the intrastate service. This method was adopted as a matter of convenience, in view of the practical difficulty of dividing the property between the interstate and intrastate services. The appellants insist that this method is erroneous, and they point to the indisputable fact that the subscriber's station, and the other facilities of the Illinois Company which are used in connecting with the long distance toll board, are employed in the interstate transmission and reception of messages. While the difficulty in making an exact apportionment of the property is apparent, and extreme nicety is not required, only reasonable measures being essential * * * it is quite another matter to ignore altogether the actual uses to which the property is put. It is obvious that, unless an apportionment is made, the intrastate service to which the exchange property is allocated will

Chas. S. Cutting, of Chicago, Ill., Philip Barton Warren, of Springfield, Ill., Wm. D. Bangs and Horace Kent Tenney, both of Chicago, Ill., and William H. Thompson, of Indianapolis, Ind., for plaintiff.

Benj. F. Goldstein, Edmund D. Adcock, G. I. Haight, Francis X. Busch, and Samuel A. Ettelson, all of Chicago, Ill., Simon Hear and Oscar E. Carlstrom, of Chicago, Ill., for defendants.

Before EVANS and SPARKS, Circuit Judges, and WILKERSON, District Judge.

PER CURIAM.

The final decree of this court entered on January 31, 1930, enjoined the enforcement of an order of the Illinois Commerce Com-

bear an undue burden—to what extent is a matter of controversy. We think that this subject requires further consideration, to the end that by some practical method the different uses of the property may be recognized and the return properly attributable to the intrastate service may be ascertained accordingly."

We have endeavored to comply with this mandate in making the separation of intrastate and interstate property, revenue, and expenses. The difficulties in so doing are, of course, apparent. Such separation has been made on the basis of actual use. Certain portions of the property were used exclusively for exchange or local intrastate business, certain portions exclusively for intrastate toll purposes, and certain portions exclusively for interstate toll purposes. Such portions of property require no apportionment, and have been directly segregated in accordance with their respective uses. The remainder of the property not so directly segregated, including the subscribers' station apparatus and equipment, of the subscribers' lines, and the local central office equipment, has been apportioned to plaintiff's exchange (intrastate), intrastate toll and interstate toll business, respectively, in accordance with its actual proportionate use for each of such classes of business. Obviously this apportionment cannot be exact. In our opinion, however, it is reasonably accurate.

In valuing the property, one of the elements to which consideration has been given is the reproduction cost new as of December 31 for each of the years 1923 to 1931. In the findings of January 31, 1930, we approved the method employed by plaintiff in determining the reproduction cost new of the property. We have adhered to that conclusion, and are now of opinion that the reproduction costs determined in accordance with the method pursued by plaintiff are substantially accurate. Such reproduction costs of plaintiff's property in service in the Chicago area, exclusive of working cash capital, materials, and supplies, construction work in progress, and going value, based upon the estimates of plaintiff's engineer, Sloan, are as follows: 1923, $148,581,042; 1924, $156,452,212; 1925, $172,257,055; 1926, $178,413,771; 1927, $191,820,622; 1928, $202,604,906; 1929, $219,327,112; 1930, $228,411,330; 1931, $226,912,713.

The evidence as to the book cost of plaintiff's Chicago area property, exclusive of working cash capital, materials and supplies, construction work in progress, and going value, as of December 31, for each of the years 1923 to 1931, is as follows: 1923, $100,040,051; 1924, $110,987,626; 1925, $126,493,467; 1926, $140,915,840; 1927, $155,508,437; 1928, $169,390,828; 1929, $182,657,561; 1930, $191,286,165; 1931, $195,422,113.

The evidence shows that the average amounts of working cash capital reasonably employed in the Chicago area were as follows: 1923, $3,000,000; 1924, $3,150,000; 1925, $3,325,000; 1926, $3,550,000; 1927, $3,825,000; 1928, $4,050,000; 1929, $4,500,000; 1930, $4,550,000; 1931, $4,250,000.

The average investment of plaintiff in its Chicago area in materials and supplies necessary in the conduct of its business as shown by the evidence are as follows: 1923, $233,022; 1924, $299,310; 1925, $358,227; 1926, $336,693; 1927, $326,599; 1928, $344,336; 1929, $276,091; 1930, $209,784; 1931, $224,433.

The amounts invested in property in the process of construction are shown by the evidence to be as follows: 1923, $812,543; 1924, $2,100,245; 1925, $1,390,296; 1926, $775,279; 1927, $5,437,059; 1928, $3,275,756; 1929, $1,974,688; 1930, $4,415,765; 1931, $441,956.

█ The valuation of plaintiff's property for 1931 and 1932 presents some difficulties which are not present in the other years. We are obliged to take notice of the general decline in property values which has accompanied the present period of business stagnation. For this reason we cannot take the reproduction estimates, based on the costs of labor and material stated in the record at their face. We have fixed values, therefore, for 1931 and 1932 which in our opinion give due consideration to the element of the present general decline in values.

█ In considering reproduction cost new as an element in arriving at value, it is necessary to deduct the actual existing depreciation in the property as compared with the new one in order to find the value of the physical elements commonly referred to as the structural value of the property.

A consideration of the evidence on this subject, including that of the witnesses who inspected the property, has led to the conclusion that the fair rate of depreciation is 16 per cent. for the years 1923 to 1928, inclusive, and 15 per cent. for the succeeding years.

█ In determining the element of going value, consideration has been given to the evi-

dence relating to the construction and management of plaintiff's Chicago property. It is well planned, effectively engineered, and properly constructed. It has a capable staff of operating employees. It is well adapted to the needs of Chicago, and through years of operation has become fully efficient and serviceable to that community. Continuously from 1923 to the present time, it has had established routines, attached customers, and trained employees. The plaintiff has been efficiently and economically operated, and has had a high standard of maintenance. The company's credit has been excellent and, if given reasonable rates, it has good earning power. The number of its telephone stations increased from 690,000 at the end of 1923 to over 980,000 at the end of 1930. Plaintiff has engineered and planned its property so that, as additions are required to meet the future needs of the community, they may be made efficiently and economically.

From a consideration of the pertinent facts, we have reached the conclusion that 8 per cent. is a reasonable allowance for going value.

■ With reference to purchases by the Illinois Company from the Western Electric Company, the Supreme Court (page 153 of 282 U. S., 51 S. Ct. 65, 70) said: "The point of the appellants' contention is that the Western Electric Company, through the organization and control of the American Company, occupied a special position with particular advantages in relation to the manufacture and sale of equipment to the licensees of the Bell system, including the Illinois Company, that is, that it was virtually the manufacturing department for that system, and the question is as to the net earnings of the Western Electric Company realized in that department and the extent to which, if at all, such profit figures in the estimates upon which the charge of confiscation is predicated. We think that there should be findings upon this point."

We have set out in the findings the gross purchases by the Illinois Company from Western Electric Company chargeable to construction accounts, as well as the gross purchases attributable to maintenance and other expense accounts. We have also made findings as to the earnings and profits of the Western Electric Company on sales to its Bell customers, including the plaintiff. We have found that, with an exception hereafter stated, the prices charged by the Western Electric Company have been fair and reasonable, and that its profits have not been excessive.

The term "average investment" of Western Electric Company, as used in the findings, includes its plant and manufacturing facilities, merchandise, receivables, and cash, less current accounts payable, all at cost to Western except merchandise, which is cost or market, whichever is lower. There is not included in Western's "average investment" any amount for patents, good will, development expense, or going concern value. A large part of Western's manufacturing plant and facilities has been constructed by it at less than they could have purchased from others, and these savings are reflected in its "average investment." Western's factories are advantageously located, well designed and equipped for efficient and economical operation. It maintains a group of engineers who plan its manufacturing operations and constantly study the problem of cheapening its products.

The Western Electric Company, because of its relationship with the Bell system, has no sales expense and no credit risk involved in its Bell business. By receiving advance estimates from the Bell associate companies of their requirements, it is able to plan its manufacturing work more efficiently and economically. These factors result in reducing Western's costs, but they are not advantages retained by Western, since such reductions in costs are passed on by it in prices charged to its Bell customers. As a result of this relationship, Western has been enabled to sell, and has sold, its manufactured articles to its Bell customers at lower prices than otherwise would have been possible. Western's earnings on investment and profit on sales vary from year to year, due to the relative weighting of several important factors, among which are reductions in prices of its products, rate of turn over, changes in costs of materials, and wage schedules. Western's relationship to the Bell system is permanent, not casual. It supplies substantially all of the requirements of all the Bell associated companies for telephone apparatus and lead-covered cable at all times. It is therefore necessary in arriving at what are reasonable earnings on investment and profit on sales in the Bell business of Western to take into consideration the results for a period of years and not merely a single year. Western's rate of earnings on its investment in its Bell business and on its investment, less the amount of its depreciation reserve account, has been substantially one-third lower than those of other

large manufacturing companies whose risks and hazards make them fairly comparable with Western. Its rate of profit on sales in its Bell business, as distinguished from earnings on investment, has been less than one-half of the rate of profit made on sales by other large, comparable manufacturing industries.

It would not have been possible for Western to sell its manufactured products as cheaply as it did except for the economies resulting from quantity production for the entire Bell system. Western develops for the present and future needs of all of those companies which are engaged in rendering a uniform and nation-wide telephone service, through plants engineered and constructed along similar lines. Because of these facts, Western's total earnings on its investment and its profit on its total sales are a fair basis for determining the reasonableness of Western's earnings in its dealings with plaintiff.

It appears from the evidence that taking the price level of December 31, 1920, as 100 per cent., the annual changes in price level of sales by Western Electric Company to plaintiff were as follows: 1921, —1.7 per cent.; 1922, —10.7 per cent.; 1923, +0.2 per cent.; 1924, —5.6 per cent.; 1925, —1.1 per cent.; 1926, —8.7 per cent.; 1927, —4.9 per cent.; 1928, —10.3 per cent.; 1929, —8.6 per cent.

The price level at the end of 1929 was 58.3 per cent. of that of December 31, 1920. Effective November 1, 1930, prices were advanced 10.2 per cent. We have reached the conclusion that, in the computations relating to value and operating expenses, this advance should not be allowed. Plaintiff attempts to justify this advance by directing attention to the large reductions made in prices between 1920 and 1930. Giving due weight to that fact, we are of the opinion that, in view of the general price trend during the years 1931 and 1932, this advance in prices should be eliminated from the computations upon which the charge of confiscation is determined. Considering, however, the reduction in prices prior to November 1, 1930, we are of the opinion that plaintiff is entitled to a maintenance of the 1930 price level during the years 1931 and 1932. We have given effect to the elimination of the 10.2 per cent. advance in the findings.

As to the "license contract" between the Illinois Company and the American Company, the Supreme Court said: "In view of the findings, both of the state commissions and of the court, we see no reason to doubt that valuable services were rendered by the American Company, but there should be specific findings by the statutory court with regard to the cost of these services to the American Company and the reasonable amount which should be allocated in this respect to the operating expenses of the intrastate business of the Illinois Company in the years covered by the decree."

In arriving at the cost to the American Company of the service rendered by it to the Illinois Company, we must consider, first, the evidence as to the work performed by the twelve departments of the American Company. Those departments are: (1) Operation and engineering; (2) development and research; (3) information; (4) personnel; (5) public relations; (6) treasurer; (7) controller; (8) secretary; (9) administration (including sundry items); (10) general service bureau; (11) operation-C (general); and (12) legal. Each of these departments furnished license contract services to the licensee companies. The reasonable amount of such costs which should be allocated to the operating expenses of the intrastate business of the Chicago area of plaintiff are as follows: 1923, $581,514; 1924, $608,586; 1925, $640,233; 1926, $741,713; 1927, $804,460; 1928, $864,886; 1929, $907,257; 1930, $1,063,725; 1931, $967,126.

The American Company, during the years 1923 to 1927, inclusive, incurred costs for maintaining the receivers, transmitters, and induction coils (telephones) furnished to the licensee companies under the license agreements. The reasonable amount of such costs which should be allocated to the operating expenses of the intrastate business of the Chicago area of plaintiff are as follows: 1923, $68,931; 1924, $83,036; 1925, $100,469; 1926, $126,225; 1927, $129,852.

Such receivers, transmitters, and induction coils (telephones) owned by the American Company and supplied to the licensee companies were subject to wear and tear and loss of value from other causes, and a reasonable annual charge for the expense of depreciation constituted a part of the costs to the American Company of furnishing such telephone instruments to the licensee companies. The reasonable amount of such cost of the expense of depreciation is represented by an annual depreciation rate of 6 per cent. applied to the cost of such instruments. The reasonable amounts of such cost of the expense of depreciation which should be allocated to the operating expense of the intrastate business of the Chicago area of the

604

plaintiff are shown by the evidence to be as follows: 1923, $115,000; 1924, $128,000; 1925, $141,000; 1926, $155,000; 1927, $169,-000.

█ The American Company is entitled to charge also as a cost of furnishing such receivers, transmitters, and induction coils (telephones) under the license agreement an annual return of 6 per cent. of the reasonable value of such instruments. The total amounts of the cost of maintaining such instruments and other apparatus which should be allocated to the operating expenses of the intrastate business of the Chicago area of plaintiff are shown by the evidence to be as follows: 1923, $342,000; 1924, $395,000; 1925, $439,000; 1926, $478,000; 1927, $476,000.

█ Under the license contract, the American Company was obligated to insure and hold harmless the plaintiff and all of the other licensee companies against loss or damage from suits or judgments for infringements of any patents, when such infringement was the result of the use of any apparatus recommended to such licensees by the American Company. That obligation constituted a substantial liability and one which might subject the American Company to large losses. The American Company provided for meeting such possible losses by setting up a contingent reserve over the period from January 1, 1923, to January 1, 1932. Such provision was a reasonable one, and it was proper to distribute the amount so set up over a number of years rather than to charge heavy losses in particular years when incurred. The only practical way by which plaintiff and other licensee companies could make compensation to the American Company for that undertaking was to charge against their revenues fairly equal amounts over the period covered by the undertaking of the American Company. The reasonable amounts which should be allocated to the operating expenses of the intrastate business of the Chicago area of the plaintiff with respect to such undertaking of the American Company, as shown by the evidence, are the following amounts in the following years: 1923, $152,-942; 1924, $147,171; 1925, $281,740; 1926, $191,060; 1927, $140,018; 1928, $137,695; 1929, $130,786; 1930, $125,532; 1931, $98,-382.

The American Company furnished office space and office furniture and fixtures at cost and at less than value to its twelve departments. The reasonable amount of these costs which should be allocated to the operating expenses of the intrastate business of the Chi-

cago area of the plaintiff are shown by the evidence to be as follows: 1923, $11,739; 1924, $5,289; 1925, $8,863; 1926, $2,094; 1927, $2,391; 1928, $2,502; 1929, $2,482; 1930, $2,605; 1931, $2,795.

█ During the period from 1923 to 1931, both inclusive, the American Company maintained average annual sums varying from $60,000,000 to $93,000,000 in the form of cash or short-term, nonfluctuating, low yield securities, for the purpose of meeting any reasonable demands of the licensee companies (excluding long lines) for funds. The amounts received as interest on such funds were insufficient to cover the cost to the American Company of obtaining money to supply such funds. The amounts of such differences which should be allocated to the operating expenses of the intrastate business of the Chicago area of the plaintiff, if such difference is distributed according to the percentages on which the actual costs to the American Company's twelve departments were distributed, are as follows: 1923, $94,-071; 1924, $106,942; 1925, $163,463; 1926, $153,878; 1927, $139,421; 1928, $140,875; 1929, $39,149; 1930, $157,135; 1931, $131,-196. We have reached the conclusion, however, that this expense is not covered by the contract, and that the amounts last above stated should not be included under the allowances made for operating expenses.

█ The evidence shows that the American Company paid taxes in each of the years 1923 to 1931, inclusive. The amounts thereof which should be allocated to the operating expenses of the intrastate business of the Chicago area of plaintiff, if such taxes were distributed in accordance with the percentages on which the actual costs to the American Company of its twelve departments were distributed, are as follows: 1923, $203,459; 1924, $211,228; 1925, $238,046; 1926, $160,-482; 1927, $154,036; 1928, $57,446; 1929, $22,390; 1930, $19,844; 1931, $45,895. We have reached the conclusion, however, that those amounts are not covered by the contract and should not be included under the allowances made herein for operating expenses.

From a consideration of the foregoing items which we think are established by the evidence, we have made findings as to the cost of the services under the contract to the American Company, and the reasonable amount which should be allocated in this respect to the operating expenses of the intrastate business of the Illinois Company for the years covered by the contract. We have also made findings as to the portions of the

amounts paid by plaintiff to the American Company for license contract services which should be allocated to plaintiff's intrastate telephone expenses in the Chicago area.

In determining the amounts to be allowed under the contract as operating expenses, we have taken the amounts found to be the costs to the American Company of those services, unless such amount for a given year is larger than the amount charged on the books of the company. In the latter case, we have allowed as an operating expense the smaller amount charged on the books of the company.

Concerning the annual charge for depreciation, the Supreme Court (page 158 of 282 U. S., 51 S. Ct. 65, 72) said: "While it has been held by this Court that property paid for out of moneys received for past services belongs to the Company, and that the property represented by the credit balance in the reserve for depreciation cannot be used to support the imposition of a confiscatory rate * * * it is evident that past experience is an indication of the Company's requirements for the future. The recognition of the ownership of the property represented by the reserve does not make it necessary to allow similar accumulations to go on if experience shows that these are excessive. The experience of the Illinois Company, together with a careful analysis of the results shown, under comparable conditions, by other companies which are part of the Bell system, and thus enjoy the advantage of the continuous and expert supervision of a central technical organization, should afford a sound basis for judgment as to the amount which in fairness both to public and private interest should be allowed as an annual charge for depreciation."

And again: "Accordingly, the [district] court should make appropriate findings with respect to the amount to be allowed in this case as an annual charge for depreciation in connection with the intrastate business."

In determining the amounts which should be allowed as annual charges for depreciation, we have given consideration to the estimates in the orders of the Illinois Public Utilities Commission and Illinois Commerce Commission, to the adjustment of such estimates which is necessary to place them on the basis of the present value of the property for the respective years for which such estimates were made by the commission, to the amounts set up by plaintiff on its books for that expense; to the adjustments of the amounts set up by plaintiff on the basis of original or book cost to make the amounts of

such allowances correspond with the present value of the property at the time such amounts were set up on the books of the company, to the experience of the Illinois Company, and to the results shown in comparable conditions by other companies which are a part of the Bell system. From a consideration of the evidence on the subjects above stated, we have determined the amounts which in our opinion are reasonable and proper amounts, fair alike to public and private interest, to be allowed as the annual charges for depreciation applicable to the intrastate portion of plaintiff's Chicago area property.

With reference to the rate of return, the Supreme Court (page 161 of 282 U. S., 51 S. Ct. 65, 73) said: "It was found by the court that the reduction in revenue caused by the rates in question, as applied to the entire business for the year 1923, would amount to about $1,700,000, and the question is whether the loss when ascertained with respect to the intrastate business would cause confiscation under the applicable standard as above set forth in the Bluefield Case, supra [262 U. S. 679, 43 S. Ct. 675, 67 L. Ed. 1176]. In order to determine this question, the court should find the rate of return which was realized from the intrastate business and the rate of return which it is fair to conclude would have been realized from that business under the prescribed rates."

Accordingly, we have made findings as to the rate of return which was realized from plaintiff's intrastate business under the rates in force for each of the years during the period in question, and also the rate of return which it is fair to conclude would have been realized in each of those years from that business under the rates prescribed by the Commission in its order of 1923.

Applying the standard prescribed by the Supreme Court, we have made findings as to the proper rate of return for each year which is necessary to avoid the charge of confiscation. One of the factors to be considered is that of the rates "generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties."

We have given weight to the facts of which the court takes judicial notice relative to the general decline in corporate earnings during the years 1931 and 1932. It is for this reason that we have fixed 6½ per cent. as the proper rate of return for 1931 and 5½ per cent. as the proper rate of return for 1932.

A public utility enjoying the advantages of plaintiff is not entitled to the large earnings made by many undertakings during periods of great prosperity. On the other hand, its return in times of business adversity should not be reduced to the extent that the earnings of many private corporations have been impaired. The range of from 7½ per cent. to 5½ per cent. as found in this case gives weight, in our opinion, to all of the elements which under the ruling of the Supreme Court we are required to consider.